[No. C005269. Third Dist. Feb. 8, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
MARK STEVEN CAHILL, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

[1]The Reporter of Decisions is directed to publish the opinion with the exception of part II of the Discussion.

**COUNSEL**

Janice M. Lagerlof, under appointment by the Court of Appeal, for Defendant and Appellant.

Fern M. Laethem, State Public Defender, Robert D. Bacon, Deputy Public Defender, Wilbur F. Littlefield, Public Defender (Los Angeles), Laurence M. Sarnoff and Douglas J. Goldstein, Deputy Public Defenders, and John M. Sink as Amici Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart and George Williamson, Chief Assistant Attorneys General, Arnold O. Overoye and Robert R. Anderson, Assistant Attorneys General, W. Scott Thorpe, Edgar A. Kerry and Shirley A. Nelson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BLEASE, Acting P. J.**—This matter comes before us upon remand by the California Supreme Court for further proceedings consistent with the views expressed in *People* v. *Cahill* (1993) 5 Cal.4th 478 [20 Cal.Rptr.2d 582, 853 P.2d 1037].

The Supreme Court overruled its controlling decisions which held that, under the California Constitution, the admission of an involuntary confession compels reversal of the conviction. It held that the prejudicial effect of the error is to be determined by weighing the properly admitted evidence under the pertinent harmless error standard. We do so, and in the published portion of the opinion we conclude that the error in admitting the involuntary portion of defendant's confession was harmless.

Defendant was convicted after a jury trial of one count of murder in the first degree, and the jury found true the allegations of special circumstances that the murder occurred in the course of burglary, robbery, and rape and that defendant used a deadly weapon in the commission of the murder. Defendant was also convicted of one count of the offense entailed in each finding of special circumstances, two counts of unlawful taking of a motor vehicle, and three additional counts of burglary. The prosecution waived pursuit of the death penalty and defendant was sentenced to an aggregate determinate sentence of 14 years together with a consecutive sentence of life without possibility of parole. He appeals contending that the trial court erred in finding a confession to the murder admissible and in conducting portions of the trial in his absence without obtaining an appropriate waiver.

Finding no prejudicial error, we will affirm the judgment.

## FACTS AND PROCEDURAL BACKGROUND

### I. *The uncontroverted evidence pertaining to the murder charge*

We first relate the pertinent facts from the physical evidence, the noncontroversial testimony, and the admissible portions of defendant's pretrial statements adduced at trial.

In February 1986 defendant moved from Arizona to Sacramento and began residing with Stephen Carroll at the Carmichael Garden Apartments at 4227 Hackberry Lane. Michelle Peterson became their roommate at the end of that month.

On the evening of March 11, 1986, someone entered the apartment of Randall Cole, who resided in that apartment complex, through the kitchen window, sometime between midnight and 2 or 3 in the morning and took Cole's car keys. The thief drove Cole's car off and left it parked in the church parking lot around the corner, at Hackberry and Cypress Avenue, less than a block away. Cole did not know defendant and had not given him permission to enter his apartment or to use his car. The next morning defendant's fingerprint impression was found on the interior window frame of Cole's kitchen window.

Sometime in mid-March 1986 defendant and Carroll broke into a vacant home on Valhalla Drive, a nearby street, and took various items of property, including a .22-caliber rifle.

Sometime after 11:30 p.m. on the evening of March 20, 1986, defendant, acting alone ("I was by myself on that"), entered the nearby home of Janet Finlay at 5790 Haskell Avenue through an unlocked sliding glass door and took her checkbooks from her purse. Finlay had never seen defendant before the preliminary hearing in this case.

In an admissible portion of his pretrial statements defendant opined that he thought he subsequently "lost" or "dropped" the checkbooks: "right in back of someone's house or behind the school or something." Defendant also asserted that after the Finlay burglary he returned to the apartment he shared with Carroll and that thereafter: "you know, we were broke and he needed 60 bucks and went out for a little night cruise over or whatever you wanna to call it. Started looking in some cars and . . . ."

The next morning sometime before 10 a.m. Louise Kruschke, a friend and coworker of Ellis Chung, went to Chung's home to determine why she had

not come to work. Chung's home on Scranton Circle is within two blocks of the Carmichael Garden Apartments. Kruschke found that Chung's car was missing, her side gate was ajar, and her purse, papers, and checkbook were strewn over the yard and patio. The front door was unlocked and Kruschke entered and discovered Chung's body in a bedroom. Kruschke summoned the police.

Chung's corpse was lying on the bedroom floor, on its back; she was clothed only by a pullover nightshirt that had been pulled up over the top of her head, covering her face. Her legs were spread. Her panties were at her feet. She had received 10 or 12 forceful blows with a heavy blunt object to her face and head causing extensive damage. No candidate blunt object was found at the scene. None of the head injuries appeared to be post mortem. Bloodstains and splatters showed that she had received the blows while in the center of her bed, at a time when her body and legs had been covered by her nightshirt or bedding.

Chung had also suffered abrasion and bruising inside her vagina caused by penetration of a foreign object, suggesting forcible intercourse. The vaginal injuries had occurred while she was still alive, at the time of the head injuries or within a matter of hours before them.

A .22-caliber bullet was found on the floor at the entryway to the bedroom. In the corner of the bedroom between the nightstand and the wall were Finlay's two checkbooks.

At 4:45 a.m. on the morning Chung was killed Al Reynolds, the custodian at the Mormon church at Garfield and Locust, located just west of the Carmichael Garden Apartments, found Chung's car parked in the church parking lot. The driver's door was ajar and papers, including the registration, were scattered around nearby. The keys were missing and there was no sign that the car had been hot-wired. Defendant's fingerprint impressions were found on the exterior of the driver's door, above the handle and on the window trim.

Chung was unmarried, she lived alone, she had no boyfriend or man that she "saw from time to time." Her blood type was A. Examination of vaginal swabs taken from Chung's corpse revealed the presence of sperm cells and type A and type B activity. A person who deposited semen found in Chung has to have type B or type AB blood. Carroll's blood type is A. Defendant's blood type is AB.

During the investigation of the Chung killing Carroll turned over to the police a .22-caliber rifle which he identified as the one taken from the vacant

home on Valhalla Drive. His fingerprint impressions and those of defendant were found on the rifle. There were five small blood splatters or smears on the rifle. Tests of the bloodstains for type were inconclusive due to the possibility of contamination by perspiration.

Late in the afternoon on the day that Chung's body was found defendant went to the apartment of Paula Manerchia and asked her to drive him to Highway 99 so that he could go home to Arizona. He was arrested a week later in Phoenix. When initially questioned by Detective Fuqua of the Phoenix Police defendant denied knowledge of the homicide. Before Fuqua divulged the sex of the victim defendant said that while he had pulled some burglaries, "there was no way he would kill a woman."

## II. *The claim of involuntary confession*

At the outset of trial defendant moved to suppress the statements he had made when questioned by Robert Bell of the Sacramento County Sheriff's Department soon after his arrest. The pertinent facts are those adduced in the *in limine* proceedings. The first day of trial was June 6, 1988, and the evidentiary hearing concerning the motion began two days later. The prosecution called Bell as a witness. Bell testified that he had been employed by the sheriff's department for a little over 15 years and assigned with the homicide detail approximately 5 years. In March 1986 Bell had been assigned to investigate the homicide of Ellis Chung. On March 28th he went to Phoenix, Arizona, to interview the defendant about the case. Defendant was in custody based on charges brought in Arizona. The Sacramento County Sheriff's Department was in the process of obtaining an arrest warrant for defendant for the murder of Chung. Present with Bell during defendant's interrogation was Detective Mitch Rea of the Phoenix Police. Bell tape-recorded the interrogation; it proceeded as follows.

Bell identified himself and asked a few preliminary questions about nonincriminating matters, e.g., eliciting defendant's date of birth. Defendant was 18 years old. Bell informed defendant that he was the investigator working on a case out of Sacramento that Detective Fuqua had spoken to defendant about earlier that day. Bell gave defendant a *Miranda* warning (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) and defendant affirmed that he understood the admonition and, with these rights in mind, wanted to talk to Bell.

Bell asked about defendant's family and elicited that defendant was born in New York and had moved with his family to Arizona six years earlier. Bell then asked if defendant wanted to ask him any questions. Defendant

asked about a statement by Carroll and Peterson that he had come home with a bloody nose and a bloody jacket.[2] Bell said he would tell defendant what they told him and then asked how defendant was acquainted with Steve. Defendant said that they had met in Phoenix and that Steve invited him to stay if he came to California. Defendant went to California and worked with Steve as a painter but they quit.

"And uh, we were just gettin'—ideas in our head, hey—it was go out and rob a house. Let's get some money and let's do something, you know. And, so first we started going around in cars and all kinds of things and we came around—we came across this one house that uh, I guess some people died and I'm not really sure but that's what Steve was tellin' me and uh, we went in there and there was a bunch of stuff in there. And uh, found some guns, found four guns. A Winchester pump shotgun with a .22 pump, a .22 bolt action, I think, and uh I think it was a CO2 rifle."

Bell then asked how many burglaries defendant and Steve had pulled. Defendant asserted that the one he described was "the main one." After a digression Bell again asked how many houses "you got into." Defendant said "one." After a further discussion of the aforementioned burglary Bell said that one of the techniques of a detective was to ask questions to which the answers were known to test credibility. Bell said there were several things that defendant mentioned that he could "plug big holes in" and said he would like the truth about the burglaries; "Then we'll talk about the incident with the old lady." In a rambling interchange defendant indicated that there had been another incident in which he entered through a sliding glass door and took a beer and then when Bell asked again how many burglaries there had been said "[t]hree."

After another long unproductive passage Bell said he was interested in a residential burglary that defendant had not yet mentioned. Bell said it was a house, not an apartment. Defendant was not forthcoming and Bell eventually said it was on Haskell Avenue. "You didn't take much. You found a purse." Defendant asked if the purse "kind of scattered on the floor?" Bell affirmed this and defendant said, "I remember that." Bell then elicited details of the date, the means of entry, the location, and the layout of the house and that defendant thought the purse had been made of cloth and had taken a checkbook.

---

[2] At trial Carroll testified that he remained at their apartment with Ed DeKruse except for trips to purchase beer on the night of Chung's death and did not accompany defendant. DeKruse and Peterson corroborated his account. Carroll and DeKruse testified, inter alia, that defendant had blood on his face and clothing when he returned to the apartment late that night. We have omitted the controversial portion of the unfavorable testimony of these three witnesses from our earlier summary of the trial evidence, and disregard it for purposes of our analysis.

Defendant then made the statement that afterward he had returned home and that Steve needed money so they had gone out and started looking in cars. Bell interjected and asked if this was going to be defendant's explanation "for your print being on our victim's car?" He then exhorted defendant to tell him the truth. Bell said he had "all the physical evidence in the world to prove" that defendant was in "that house." Bell said, "I'm here really to try to see what I can do for you." Bell implied he could understand how the incident had happened and asked, "Have you admitted it to yourself yet?" Defendant said "No." Defendant said he wanted to know what physical evidence, if any, was found. Bell replied there was "a lot of physical evidence found," that it was still being processed, that they had a process to obtain fingerprints from paper, he implied they had found defendant's fingerprints in the car, and said, "We've got you, now, inside our victim's house."

Bell said he needed to know how it happened. He asked if the woman had come back to the house after defendant had entered. He asked again, "What happened when you—when you were inside there?" Defendant replied, "Nothing." Bell then asked a series of questions to which defendant did not respond whose import was that Steve might have been with defendant or responsible "for this."

Defendant replied by asking, "what if me or Steve did do it and we told you about it, what would become of that?" Bell replied, "That's up to a judge to decide and it's—a lot of it depends on what was going through your mind at the time. And that's what we would need to talk about right now."

Bell then suggested "sympathetic" ways in which the incident might have occurred: defendant was scared to death, the woman interrupted him, he was not a murderer, he did not mean to do it, he was on drugs, he had been drinking heavily for days, he was cornered, or she was a "martial artist or something." Bell then asked if he should call to see if Steve's fingerprints were found at the house. Defendant said Bell should do so, but declined to elaborate. Bell again exhorted him at length to explain and asked if defendant was holding out in the hope that there was insufficient physical evidence. He reiterated that he had fingerprints and explained that the checkbook which defendant had admitted to taking in the earlier burglary had been found, "Next to Mrs. Chung's bed." Bell professed to be looking for a way to show defendant that Bell was "not trying to screw him." Bell completed his exhortation as follows.

"You're—you're stuck. And that's why I want to hear from you the mitigating factors. I want to hear why this happened. If I don't hear from you

why this happened, I'm going back to Sacramento and I'm going to assume that this was a cold-blooded premeditated murder of this little lady. Cold-blooded premeditated murder. I mean, what else can I assume?"

Defendant asked, "So, what does that mean? They're going to kill me or what?" Bell replied that would not happen in California, "we got a death penalty but it ain't there. And this is not a—I'm not sure this was premeditated. See, but without you're [*sic*] telling me about it, I don't know." Bell then again suggested some possible sympathetic considerations urging defendant to "help yourself" by telling what happened, asserting "It's for your own benefit at this point." Defendant inquired vaguely about what difference it would make if Steven were involved. Bell said he would need to know that and asked if that were the case.

Detective Rea then made two points. He said Steve "isn't gonna cover up for you." He then made the following assertion.

"The other thing I know be it California or Arizona, there's all the difference in the world in planning to kill somebody, thinking it out and going over there and doing it. And on the other side, getting caught in the middle of a burglary and maybe getting into a struggle or maybe even having some—the person that lives there attack you or something and just one thing leads to another. It's like night and day, you know."

Bell then said, "That's what we need to find out." Defendant asked if he was charged with murder. Bell said yes and then clarified that defendant would soon be charged with murder in the first degree.

Bell then said he would explain briefly the rules of murder in California and gave the following synopsis.

"Murder in the first degree in California is when somebody lies in wait and premeditately murders somebody. Okay. Murder in the second degree is when say two people get it [*sic*] an argument and the person uh gets real mad and goes gets a gun and comes back and shoots the guy or whatever, that is murder in the second degree. Uh, there's not really the premeditated thing. It just sort of happens. It also could be, um, the next thing is vol—is voluntary manslaughter. That is when two people get into a fight and one kills the other but maybe he didn't mean to do it, but by the very actions uh he knew that it might happen, you know. That's a—*that's a real over simplification of the whole thing*. But, we need to know where this falls. [Bell then again suggested that the victim may have attacked defendant and that his natural inclination would be to flee.] But if she had you cornered you're stuck.

Okay. And it just happened. In which case, it wouldn't fall into first degree murder."

After this Bell returned to exhortations to tell what happened coupled with questions. Eventually defendant asked about the length of the prison term. Bell said he did not know and suggested that whether it was a cold-blooded murder was significant. Bell said, "if there's mitigating circumstances and if you were caught in there, that changes the whole thing. That's gonna—that's gonna have an affect on how much time you do." Defendant said that the term was 20 to life no matter what. Bell said that was not true in California. Defendant said, "Sure it is. That's anywhere." Bell said, "Okay." He then said he did not want to talk sentencing, that he did not know what was going to happen, noting that he was not a judge, jury, or attorney. Bell again asserted that he was, "[t]rying to help you."

Defendant again inquired about Michelle and Steve. Bell said that their statement was academic in view of the irrefutable physical evidence. Bell asked if there was any preexisting reason for defendant to pick out Chung and kill her. Defendant said "maybe" he did not kill her. Bell said he needed to know what happened so that he could tell defendant's parents. He suggested that he could tell defendant's parents that defendant was sorry. He then said, "That's an important issue here, [defendant]. Remorse is a big factor when it comes to an incident like this. A judge and a jury likes to see the fact that this person realizes, hey, he did wrong and he's going to try and put it behind him. . . . When a person denies doing something thought that obvi—uh, you can only assume that there's no remorse."

Bell asked how defendant felt about killing Chung and defendant asked how Bell knew that he did the killing. Bell told him not to ignore the obvious and again implored him to think about his parents. Defendant asked whether he would be extradited. Bell said it depended on whether defendant would waive extradition. He then returned to exhortations to tell the truth, coupled with questions about how the incident might have occurred. Bell then said that Detective Rea had to leave and that Bell could not hold him up all night. Detective Rea then suggested that defendant think about what a jury would do with the evidence that Bell already had. Bell said they already had enough evidence to go to a jury and Rea said "They're going to hang you out to dry with what he's got now. Only thing you can do is help yourself now."

Detective Rea then made the following remarks.

"You know, the questions they ask this guy on the witness stand, aren't all going to be about the evidence. They're going to ask him about talking to

you. They're going to ask him about what he thought you were like. Whether you acted like you give a shit about what you've done or not. And based on what you've told him and the way you've acted so far, you don't have to be too brilliant to figure out how he's going to answer that."

Bell then suggested that defendant's insistence on talking about the situation in hypothetical terms indicated defendant's only concern was with himself. Bell asked defendant rhetorically whether Detective Rea's remarks were correct. Defendant said yes. Bell again asked what happened. Detective Rea again said it could not get any worse and that defendant could only help himself by talking. After further exhortations by Bell defendant asked if they had to have the tape recorder on. Rea told him not to worry because all it would do is help defendant. After another series of unsuccessful exhortations, including another assertion that, "We're here to help," Bell asked if it would be easier if the tape recorder was shut off. Defendant said yes and Bell turned off the machine. About an hour and one-half had elapsed since the interrogation commenced.

When Bell turned on the tape recorder again defendant related a detailed account of the incident resulting in the death of Chung. After the earlier incident on Haskell defendant returned to the apartment with the checkbook. Steve came up with the idea of taking the gun and holding somebody up. They went out searching through the houses. They came to a house with an open front door. The lady was in the kitchen. Defendant removed a purse from the bedroom and briefcase at the front door and searched them outside the house. He and Steve then entered and found the lady in the bedroom. Steve threatened her with the gun and defendant searched another room. She yelled, get out of my house, there was screaming and Steve hit her with the gun. After that they took the car keys and drove off with her car. When asked about "the sex," defendant said that after the woman had been subdued Steve pulled her off the bed, "and layed [sic] her down on—it was just sick."

That concludes our recitation of the events disclosed by the tape recording of Bell's interrogation of defendant.

The trial court was unable to complete the hearing on suppression of the confession on the first day of trial. The matter was continued to June 30, 1988, the 16th day of trial. The matter was argued and then taken under submission at that time. The prosecutor asked that the court inform him prior to his opening statement of its decision on admissibility. The court said it would do so by telephoning both counsel, but that it would not be able to put the ruling on the record until the next court session.

On July 5, 1988, the prosecutor gave his opening statement. He told the jury that they would hear the tape recording of the interrogation and summarized its contents, including the portion of the tape containing defendant's

confession to the burglary of the Chung residence and his account of the ensuing killing and sexual assault of Chung. Later that day, after the testimony of several prosecution witnesses, the trial court addressed defendant's suppression motion. The trial court at that time explained its reasoning, in essence, that there had been no false promises of leniency. The trial court noted that it had informed the parties of its ruling on "Friday" and said it was "complete[ing] the record . . . ."

On July 15, 1988, the 24th day of trial, the tape recording of defendant's confession was played to the jury. The reporter's transcript indicates that there had been a prior discussion, apparently unreported, about the playing of the tape. There is no objection in the reporter's transcript to the evidence at the point the tape was played. However, the minutes for the day contain an entry asserting that defendant's prior motion to suppress the confession, "at this time DENIED by the Court." The next entry in the minutes is the notation that the tapes were played for the jury "for the balance of this date's proceedings."

## DISCUSSION

### I

Defendant contends that the trial court prejudicially erred in ruling that evidence of his confession was admissible.

His principal argument is that the confession was involuntary because it was the product of false promises of leniency coupled with false and misleading representations about the law of murder.

 The Attorney General replies that the defendant was neither threatened nor improperly promised leniency in the course of the interrogation and that "to the degree that [Bell] may have misrepresented the law or the facts" the deception is not material because it was not reasonably likely to have produced an untrue statement.[3]

---

[3]The Attorney General also suggests that the defendant has waived the right to complain about the introduction of the confession by failing to renew the objection made in his motion *in limine* at the point of actual admission of the confession at trial. He relies upon the principle that motions *in limine* normally are not binding and must ordinarily be renewed at trial. However, that rule is not applied where the motion is heard during trial and the matter to be decided is as fully developed for purposes of admissibility as at the point of actual admission. (See *People* v. *Karis* (1988) 46 Cal.3d 612, 634-635, fn. 16 [250 Cal.Rptr. 659, 758 P.2d 1189].) Moreover, there is an indication in the clerk's minutes that an objection immediately preceded the playing of the tapes. Finally, because "special policy considerations preclude the use of involuntary statements," review of the admissibility of such statements based on the

Defendant has the more persuasive argument, and the contention that the trial court erred has merit. However, as appears, that error was not prejudicial.

### A. *The trial court erred in admitting the entirety of defendant's statements to Bell.*

■ "It is axiomatic that the use in a criminal prosecution of an involuntary confession constitutes a denial of due process of law under both the federal and state Constitutions. . . . In California, before a confession can be used against a defendant, the prosecution has the burden of proving that it was voluntary and not the result of any form of compulsion or promise of reward." (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 602 [147 Cal.Rptr. 172, 580 P.2d 672], citations omitted.) Since in this case the homicide occurred after enactment of article I, section 28, of the California Constitution, the voluntariness of the statements must "be proved by a preponderance of the evidence at trial." (*People* v. *Markham* (1989) 49 Cal.3d 63, 71 [260 Cal.Rptr. 273, 775 P.2d 1042].) In the absence of conflicting testimony, we "examine the uncontradicted facts surrounding the making of the statements to determine independently whether the prosecution met its burden and proved that the statements were voluntarily given without previous inducement, intimidation or threat." (*People* v. *Hogan* (1982) 31 Cal.3d 815, 835 [183 Cal.Rptr. 817, 647 P.2d 93]; accord, *People* v. *Thompson* (1990) 50 Cal.3d 134, 166 [266 Cal.Rptr. 309, 785 P.2d 857].)

The application of the axiom that involuntary confessions are not admissible is not always a simple matter; the concept of voluntariness is multifaceted and has been described as a "potential morass." (*People* v. *Disbrow* (1976) 16 Cal.3d 101, 112, fn. 12 [127 Cal.Rptr. 360, 545 P.2d 272]; also see, e.g., 1 LaFave & Israel, Criminal Procedure (1984) § 6.2, p. 442, listing derogatory commentary concerning the term "voluntary" in this connection.) "[A] complex of values underlies the stricture against use by the state of confessions which, by way of convenient shorthand, this Court terms involuntary, and the role played by each in any situation varies according to the particular circumstances of the case." (*Blackburn* v. *Alabama* (1960) 361 U.S. 199, 207 [4 L.Ed.2d 242, 248, 80 S.Ct. 274].)[4]

The reason for excluding involuntary confessions is to provide the accused with an "essentially free and unconstrained choice" whether to confess

---

evidence that is not in conflict is permitted despite the lack of a timely objection. (See, e.g., *People* v. *Underwood* (1964) 61 Cal.2d 113, 126 [37 Cal.Rptr. 313, 389 P.2d 937].)

[4]The complex of values which underlies the concept of voluntariness is summarized in the following passage in *Jackson* v. *Denno* (1964) 378 U.S. 368 [12 L.Ed.2d 908, 84 S.Ct. 1774, 1 A.L.R.3d 1205]. "It is now inescapably clear that the Fourteenth Amendment forbids the use of involuntary confessions not only because of the probable unreliability of confessions that are obtained in a manner deemed coercive, but also because of the 'strongly felt attitude

(*Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218, 225-226 [36 L.Ed.2d 854, 93 S.Ct. 2041]); that is to say, free of police conduct which is overreaching (see *Colorado* v. *Connelly* (1986) 479 U.S. 157, 163-164 [93 L.Ed.2d 473, 482, 107 S.Ct. 515]). Many factors bear on the question. "In determining whether a defendant's will was overborne in a particular case, the [United States Supreme Court] has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." (*Schneckloth* v. *Bustamonte, supra*, 412 U.S. at pp. 225-226 [36 L.Ed.2d at p. 862].)

The criteria which measure an involuntary confession must be discerned in the case law.

■ "It is well settled that a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency whether express or implied." (*People* v. *Jimenez, supra*, 21 Cal.3d at p. 611.) Since threats of harsh penalty often contain an implicit promise of more lenient treatment, they are treated as promises of leniency. (See *People* v. *McClary* (1977) 20 Cal.3d 218, 229 [142 Cal.Rptr. 163, 571 P.2d 620].)

The Attorney General takes no issue with this doctrine, but argues that "Bell never promised leniency in any event" and "never threatened appellant with the death penalty or with any particular sentence . . . ."

The critical question is: when does a representation in the course of an interrogation about the penal consequences of silence or untruthfulness amount to a threat or promise?

Although often the case, a "promise" is not restricted to representations concerning the future conduct of the person making the promise. Most often a promise pertains to such a commitment. (See Rest.2d Contracts, § 2.) We also use "promise" to describe promises of action or inaction by third persons, as in a guaranty, and even to a promise of the occurrence of events not within human control, as in a warranty of an existing or past fact. (See *id.*, coms. c, d.) Whether a representation amounts to a promissory guarantee or warranty depends upon the legal effect that attends the representation. (*Ibid.*)

As to confessions the place to begin is with *People* v. *Hill* (1967) 66 Cal.2d 536, 549 [58 Cal.Rptr. 340, 426 P.2d 908]: "The line to be drawn

of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will,' . . . and because of 'the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves.' " (*Id.* at pp. 385-386 [12 L.Ed.2d at p. 921], citation omitted.)

between permissible police conduct and conduct deemed to induce or to tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police. . . . [¶] When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper in such police activity. On the other hand, if in addition to the foregoing benefit, or in the place thereof, the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. The offer or promise of such benefit need not be expressed, but may be implied from equivocal language not otherwise made clear. (See *People v. Thompson* (1890) 84 Cal. 598, 605-606 [24 P. 384]; *People v. Barric* (1874) 49 Cal. 342, 344-345; *People v. Leavitt* (1929) 100 Cal.App. 93, 95 [279 P. 1056]; cf. *People v. Nelson* [1964] 224 Cal.App.2d 238, 251 [36 Cal.Rptr. 385].)"[5]

This analysis was applied in *People v. Johnson* (1969) 70 Cal.2d 469, 478 [74 Cal.Rptr. 889, 450 P.2d 265]. Whether a promise or threat serves as an inducement to confess is succinctly stated as follows.[6] "Defendant testified that the officers told him his companions had accused him of shooting the victim, and that there was a first degree murder charge under investigation for which he could get the gas chamber. There was evidence that they exhorted him to tell the truth and indicated that all they were interested in 'is the truth.' However, he stated they also told him no one would believe him because he denied everything, if they were the jury they would give him the gas chamber, if he had to go into the courtroom it would be best for him to go in the best light, and by denying it and not saying anything this would show malice and hatred, or just a senseless killing of a white man.

---

[5]The passages in *Barric*, *Thompson*, and *Leavitt* to which *Hill* points concern confessions that were held involuntary on similar grounds. In *Barric* the accused was told " 'It will be better for you to make a full disclosure.' " (49 Cal. at p. 345.) In *Thompson* the accused was told " 'It would be better for him to come out and tell all he knew about it . . . .' " (84 Cal. at p. 605.) In *Leavitt*, the accused was told "it would 'be much better for him' to make a confession." (100 Cal.App. at p. 94.) In *Nelson*, the statement that if the accused " '*would rely on the truth it would help him*,' " did not warrant exclusion because immediately thereafter the policeman who made the statement explained that ". . . if he relied on the truth, he had a better chance of rehabilitating himself . . . ." (224 Cal.App.2d at p. 245, fn. 3, original italics.)

[6]We note that *Johnson* predates the *Miranda* decision and the accused had received a misleading admonition that a statement could not be used in court, but only for purposes of investigations. (70 Cal.2d p. 474.) However, the reasoning of the opinion concerning the character of the subsequent interrogation tactics used as amounting to a threat or promise is logically independent of the consideration that the accused was misinformed concerning the uses to which the statement might be put.

"This appears to be more than merely pointing out to a suspect that which flows naturally from a truthful and honest course of conduct. It carries the implication that by cooperating and telling what actually happened he might not be accused of or found guilty of first degree murder (i.e., more lenient treatment by the court or jury). To someone unskilled and uncounseled in the law it might have offered a hope that since no money was taken in the robbery and if, as he claimed he did not do the shooting, that he might be cleared of any serious charges. Because of the felony-murder rule his statements amounted to a confession of first degree murder (see Pen. Code, § 189). It stretches the imagination to believe that he knowingly and intelligently waived his right to be free from self-incrimination." (*Id.* at pp. 478-479.)

Notably, the "promise" or inducement to confess in *Johnson* was the misleading implication that by cooperating the accused might not be accused of or found guilty of first degree murder. Alternately, the inducement may be viewed as a "threat" that unless he confessed to the less culpable role of aider and abettor, he would be prosecuted and convicted as the shooter and thus made subject to a harsher penalty. In either event, there is no suggestion that the officers implied that they would do anything to or for the accused.

*Hill* and *Johnson* are relied upon in *People* v. *McClary, supra,* 20 Cal.3d 218. The accused was given a *Miranda* warning and immediately said she would like an attorney, asserting that she did not do anything. The interrogating officers continued to question her. (*Id.* at pp. 222-223.) They accused her of lying and asserted they could prove that she was lying. One of the officers explained that she could be tried either as a principal to the murder, thus made subject to the death penalty, or as an accessory after the fact. (*Id.* at p. 223.) The statement concerning the death penalty was incorrect because that penalty could not be imposed on a minor. (*Ibid.*)

The first interrogation terminated the fourth time the accused said she would rather wait and talk to an attorney. (*McClary, supra,* 20 Cal.3d at pp. 222-224.) Four hours later the accused initiated another interview, asserting that she did want to discuss the case in the absence of an attorney. (*Id.* at p. 224.) In that interview she made incriminating admissions. (*Id.* at p. 225.)

The People conceded in *McClary* that the text of the first interview was inadmissible because the officers violated *Miranda* in continuing to talk to the accused after she said she wanted an attorney. At issue was whether the accused had voluntarily initiated the second interview. (20 Cal.3d at pp. 227-228.) The *McClary* opinion treats this question as involving a promise

of benefit and holds that it was involuntary because the first interrogation, which involved threats of punishment and promises of leniency, brought about the second interview. (*Id.* at p. 229.) "The clear implication of the officer's remarks was that unless defendant changed her story and confessed her true involvement in the crime she would be tried for murder." (*Id.* at p. 223.) The opinion places emphasis on the following remark of one of the officers. " '*Unless your story changes to where you can say something else happened* and we can prove you true, then you're going to be tried the other way.' " (*Id.* at p. 224, original italics.)

As in *Johnson*, in *McClary* the threat or promise did not consist of a representation that the officers would do something. They did not say they would take favorable action nor even that they would bring influence to bear upon other actors in the criminal justice system. "In the matter before us, the record reflects that the officers repeatedly branded defendant a liar, and advised her that unless she changed her statement and admitted the true extent of her complicity, she would be charged as a principal to murder and would face the death penalty. In addition to this direct, and partially false (Pen. Code, § 190.3) threat, the officers strongly implied that if defendant changed her story and admitted mere 'knowledge' of the murder, she might be charged only as an accessory after the fact." (*McClary, supra,* 20 Cal.3d at p. 229.)

 In this case the basis of Bell's effort to persuade defendant to admit that he was inside the house and had knowledge of the killing is his representation that defendant could avoid a charge of murder in the first degree if the killing were not premeditated. The thrust of Bell's argument to defendant was that he should tell what had occurred to dispel the implication that the murder was premeditated.

In the context of the interrogation session, the remarks of Bell and Detective Rea amount to a threat, or promise of leniency, within the meaning of *Hill, Johnson,* and *McClary*. (Also see, e.g., *Jimenez, supra,* 21 Cal.3d at pp. 610-612 [mention that the defendant was subject to the death penalty and statement that defendant might get leniency from the jury if he gave a statement to the police officers is a promise of leniency].) The clear implication of their remarks is that defendant would be tried for first degree murder *unless* he admitted that he was inside the house and denied that he had premeditated the killing. This is the same kind of interrogation tactic employed in *Johnson*. Under the case law it counts as an implied promise that if the defendant did admit a role in the killing but had not premeditated he might avoid trial and conviction of first degree murder.

Several other considerations impel the view that the interrogation tactics amounted to a false promise. After Bell introduced the topic of cold-blooded premeditated murder he assured the defendant that the death penalty was inoperative. This prediction was inappropriate because it understated the seriousness of defendant's situation. Bell's assurance was not unqualified. He noted that California had a death penalty and implied that the death penalty law would be inapplicable if the killing was unpremeditated. The false implication added the dimension of the death penalty to the proffered distinction between premeditated and unpremeditated killings. The implication was advanced by the materially deceptive account of the law of murder that he gave defendant. It is not plausible to suppose that a homicide investigator of Bell's experience was unaware of the felony-murder rule and the consideration that a statement admitting defendant's presence in the house would amount to a confession of felony murder. Defendant had admitted a prior burglary that evening and admitted that he left home with his companion to look for money in other people's cars at the time that would have placed him in Chung's home.

The Attorney General argues that if this was deception it is immaterial because it is not the sort of deception that is reasonably likely to procure an untrue statement. ■ There is a substantial body of case law which contains an assertion that deception alone will not render a confession involuntary unless it is of a type reasonably likely to procure an untrue statement. (See, e.g., *People* v. *Atchley* (1959) 53 Cal.2d 160, 171 [346 P.2d 764]; Annot., Admissibility of Confession as Affected by Its Inducement Through Artifice, Deception, Trickery, or Fraud (1965) 99 A.L.R.2d 772; 1 Witkin, Cal. Evidence (3d ed. 1986) §§ 617-618, pp. 593-594.) However, the term "deception" in these cases does not apply to false promises of leniency. Even collateral deception is material if it is allied with matters amounting to a false promise of leniency; "deception which is 'used to make more plausible' a promise of assistance does render a statement inadmissible." (*People* v. *Hogan, supra*, 31 Cal.3d at p. 841.)

■ Here, Bell's account of the law of murder was materially misleading in omitting any reference to the felony-murder doctrine. The deceptive omission made more plausible the implicit promise that a first degree murder charge might be avoided if there were a confession showing no premeditation. The promissory character of the representations was enhanced by Bell's repeated assertions that he was present to help defendant. Also enhancing the implication of leniency in return for a statement were the repeated remarks about showing remorse and the implication that Bell would testify favorably about remorse if defendant would talk.

The Attorney General notes that the California Supreme Court, facing a claim of involuntary confession, recently said: "The line between a threat (or a promise) and a statement of fact or intention can be a fine one." (*People* v. *Thompson, supra*, 50 Cal.3d at p. 169.) In that case the defendant's girlfriend was arrested with him. (*Id.* at p. 151.) The detective began the interrogation by saying that he was not convinced of her innocence, that the district attorney would have to decide whether to release her, and that information had not yet come forward which would cause the detective to release her. The Supreme Court found nothing improper in these remarks. (*Id.* at p. 169.) However, the court found later statements on this theme "somewhat more problematic [since they] could have been understood to convey that defendant's refusal to confess was responsible for [her] incarceration." (*Ibid.*) However, the court found that since the defendant's incriminating statements were not made until several hours after this topic had been left they "were not induced by any implied threat or promise made hours earlier." (*Ibid.*)

We discern nothing in the opinion which undercuts our previous discussion. For the reasons already given, the interrogation in this case was over the line and amounted to a promise of leniency. As in *People* v. *Johnson, supra*, 70 Cal.2d at page 479: "This appears to be more than merely pointing out to a suspect that which flows naturally from a truthful and honest course of conduct."

That does, as is indicated by *People* v. *Thompson, supra*, 50 Cal.3d 134, leave the question of causation. An implied promise of leniency must be "a motivating cause of the confession." (See, e.g., *People* v. *Johnson, supra*, 70 Cal.2d at p. 478.) As noted, the standard of proof on the question of causation is a preponderance of the evidence.

The trial court did not address causality. ■ Where the dominant focus of an interrogation is an implied promise of leniency and a confession ensues, absent adduction of countervailing evidence, e.g., a substantial time lapse between the implied promise and the incriminating statements, the confession must be attributed to that implied promise. (See *People* v. *Jimenez, supra*, 21 Cal.3d at pp. 613-614 and at pp. 614-615 (conc. opn. of Clark, J.) calling such a confession "involuntary *as a matter of law*." (Originial italics).)

■ Despite persistent questioning, emphatic exhortations, and confrontation with facts strongly impelling the conclusion that he was involved in the homicide, the defendant repeatedly resisted making a statement conceding his presence in the residence of the murder victim and gave that

statement only after the representation that in so doing he might avoid a charge of first degree murder. The record of the interrogation established that defendant was a youth raised in other states, who had just attained his majority, and whose education extended only to the eighth grade.[7] To such a person "unskilled and uncounseled in the law" the representations that premeditation was an element of first degree murder "might have offered a hope" that if defendant confessed but denied premeditation he might be cleared of the most serious charges against him. (See *Johnson, supra,* 70 Cal.2d at p. 479.)

A finding that defendant, more probably than not, would have confessed regardless of the improper representations on this record would be sheer speculation. Accordingly, we are constrained to hold that the trial court erred in admitting evidence of defendant's statements in response to interrogation after Bell introduced the topic of "cold-blooded premeditated murder."

B. *The error in admitting the confession was not prejudicial.*

That brings us to the question of prejudice. The Attorney General argues that the error was not prejudicial because in light of the properly admitted evidence and the limited nature of the involuntary confession here its admission was harmless beyond a reasonable doubt. The defendant replies that it cannot be said that the error was harmless beyond a reasonable doubt because it "shored up and corroborated physical evidence" and because the prosecutor relied on the confession in his closing argument. As appears, the Attorney General has the more persuasive argument and the contention that the error was prejudicial is not meritorious.[8]

---

[7] No information about defendant's mental competency or problems was adverted to in the suppression proceedings. Defendant suggests that, since as a reviewing court we examine the uncontradicted facts to determine independently whether the finding of voluntariness was proper, we may consider evidence of defendant's mental capacity adduced in two prior trials of the issue of his capacity to stand trial. The trial court noted on Tuesday, July 19th, two weeks after the first ruling on suppression, that it had only become aware the trials on the issue of his competency to stand trial "a matter of a couple of days ago." We need not determine whether evidence not brought to the attention of the trial court in the *in limine* proceedings may be considered on appeal as it is not crucial to the resolution of the voluntariness question.

[8] In *Cahill* the Supreme Court suggested that the harmless error standard for an involuntary confession in some circumstances might be less than the beyond-a-reasonable-doubt-standard. "The prejudicial effect of such error is to be determined, for purposes of California law, under the generally applicable reasonable-probability test embodied in article VI, section 13, of the California Constitution. (*People* v. *Watson, supra,* 46 Cal.2d at p. 836 [299 P.2d 243].) Of course, because the *Watson* standard is less demanding than the harmless-beyond-a-reasonable-doubt standard mandated by the applicable federal constitutional authorities (see *Arizona*

The defendant suggests that his "description of the circumstances leading up to the homicide" was prejudicial because it "provided evidence placing the killing squarely within the special circumstances allegations" and "provided the *only* evidence upon which the prosecutor's theory of what occurred inside Chung's house was based."

What occurred inside Chung's house is manifest from the physical evidence—someone savagely beat her, robbed her, raped her, and left her to die late at night on March 20, 1986. Defendant suggests that his account significantly showed the rape was connected with, i.e., contemporaneous with, the killing. However, there is no credible prospect that Chung may have suffered an independent rape within hours of the time she was beaten and left to die, disrobed and in a position and location implying sexual depredation.

As the Attorney General notes, the inadmissible portion of defendant's extrajudicial statements could only have harmed him insofar as he confessed to the murder under a theory of burglary felony murder, i.e., insofar as he admitted that he entered Chung's home with the intent to steal and that her killing ensued during the burglary. The killing was in 1986, hence a finding that the special circumstances allegations were true required a finding that defendant intended to kill unless he was the actual killer. (See *Tapia* v. *Superior Court* (1991) 53 Cal.3d 282, 298 [279 Cal.Rptr. 592, 807 P.2d 434].) Such an instruction was given. Defendant's account of the killing, rape, and robbery was exculpatory since he denied that he was the actual killer or that he intended the killing.

■ The question is whether there is a "reasonable possibility" that the evidence of defendant's admissions that he entered Chung's dwelling with the intent to steal and that her death ensued "might have contributed to the conviction" of felony murder. (See *Chapman* v. *California* (1967) 386 U.S. 18, 23 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065], internal quotations omitted.) The answer is no. This is not a case where subtracting the inadmissible evidence there is a "reasonably 'strong circumstantial web

v. *Fulminante, supra,* 499 U.S. 279, 306-312 [113 L.Ed.2d 302, 329-333, 111 S.Ct. 1246, 1263-1266]; *Chapman* v. *California, supra,* 386 U.S. at p. 23 [17 L.Ed.2d at p. 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]), whenever a confession admitted in a California trial has been obtained by means that render the confession inadmissible under the federal Constitution, the prejudicial effect of the confession must be determined under the federal standard." (*Cahill,* 5 Cal.4th at pp. 509-510.) Neither party examines the prospect of application of the lesser test here. We take the matter as presented by the parties. As we are given no reason to suppose that the reach of the California Constitution's prohibition on self-incrimination exceeds that of the federal Constitution in a manner material in this case we imply no view on that matter.

of evidence' "; it is, rather, one in which we discern no prospect that "honest, fair-minded jurors might very well have brought in not-guilty verdicts." (See *Chapman*, 386 U.S. at pp. 25-26 [17 L.Ed.2d at p. 711].) Such a "reasonable possibility" requires that, in the admissible evidence there must exist some candidate theory and basis for reasonable doubt as to defendant's guilt of felony murder. (Cf., *People* v. *Roy* (1989) 207 Cal.App.3d 642, 655-656 [255 Cal.Rptr. 214].) Here there is none.

A bare bones synopsis suffices. A person or persons entered Finlay's house late on the evening of March 20, 1986, and removed her checkbooks. A person or persons killed and raped Chung at her house on the night of the Finlay burglary. Defendant admitted sole perpetration of the Finlay burglary and that later that night he left home with a larcenous intent. His fingerprint on Chung's car, in the context of the other uncontroverted evidence, compels the conclusion that he was at her house that night. The Finlay checkbooks in the victim's bedroom compel the conclusion that either defendant or Carroll or defendant and Carroll were there after the Finlay burglary. Defendant's concession that *he* lost or dropped the Finlay checkbooks and the blood typing evidence showing that Carroll could not have been the only source of the semen found in Chung compel the conclusion that defendant was in the victim's bedroom and raped her.

As related, the only prospect for an alternative explanation of Chung's rape and death is that she was the victim of an unrelated third party with B or AB type blood who coincidentally struck on the same night as defendant and Carroll. In our judgment, that prospect is so incredible that no honest, fair-minded jury would entertain it as a ground for reasonable doubt of defendant's guilt.

We conclude that the admission of the involuntary portion of defendant's extrajudicial confession was harmless beyond a reasonable doubt.

II*

. . . . . . . . . . . . . . . . . . . . . . . . . . .*

*See footnote 1, *ante*, page 296.

## DISPOSITION

There is no prejudice attributable to the contentions of error tendered by the defendant. The judgment is affirmed.

Sims, J., and Davis, J., concurred.

A petition for a rehearing was denied March 4, 1994, and appellant's petition for review by the Supreme Court was denied June 2, 1994. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.