Filed 12/23/13  P. v. Valentine CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHAEL W. VALENTINE, JR.,<br><br>    Defendant and Appellant. | B238036<br><br>(Los Angeles County<br>Super. Ct. No. BA328306) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert J. Perry, Judge.  Affirmed.

John A. Colucci, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Peggy Z. Huang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Michael Valentine appeals from the judgment entered upon his jury conviction of first degree murder, committed during a burglary. Defendant argues the court made reversible errors in denying his motion to suppress his statement to police, and in not instructing the jury on mistake of fact and consensual entry as defenses to burglary. He also argues counsel was ineffective for not seeking these instructions. We disagree and affirm.

## FACTUAL AND PROCEDURAL SUMMARY

The victim, David Isaac, was shot in his home during the night of October 27, 1989. His daughter Galit, who was 10 years old at the time of the shooting, testified at trial that she came out of her bedroom when she heard screaming and saw her father pointing a gun at a man.[1] The man was holding her mother in a chokehold and was pointing a gun back and forth at her mother and father. Her parents were asking the gunman what he wanted, and her mother was offering to give him her jewelry. The gunman then pushed her mother down, and he and her father fought. Galit heard three gunshots. She saw the gunman throw something through the dining room window and run out. He did not take any of her mother's jewelry. David Isaac died of gunshot wounds to the chest and abdomen. His wife suffered bruises all over her body.

One of the weapons found at the scene, a .9 millimeter semi-automatic Smith & Wesson, belonged to David Isaac. The other, a .38 caliber Smith & Wesson revolver, was registered to the owner of a motel in Valley Village. The motel had been robbed a day earlier, and a revolver belonging to the owner had been taken from the front desk during that robbery. The motel clerk described the robber as a light-skinned African-American man and identified defendant as the robber at the preliminary hearing and at trial.[2]

---

[1] According to Galit Isaac's statement to police after the shooting, the man had sideburns and a moustache like one of her uncles.

[2] The motel clerk had not been able to identify defendant in a photographic line-up in 2006.

2

Fingerprints collected from a Western Union form, which the Isaacs turned over to police in the days after the shooting, were enhanced, submitted for testing, and entered in the Automatic Print Identification System in 2006. They matched defendant's prints in the system and prints taken at his preliminary hearing in 2008. In 2006 and 2008, DNA testing was performed on material collected from the scene of the shooting in 1989. Blood on glass from a broken window next to the dining room was traced to defendant. Defendant also was a contributor to DNA samples recovered from the revolver, and a predominant donor of DNA found on its trigger guard. Defendant could not be excluded as a contributor to the genetic profile obtained from David Isaac's fingernail clippings.

Two detectives interviewed defendant in December 2006, while he was incarcerated for another crime. During the interview, defendant admitted going to the Isaacs' house, but not to rob them. He claimed rather that a relative of the Isaacs, a "nephew," had arranged for him to scare David Isaac's wife into doing something about the family business, which had something to do with a jewelry store.[3] David Isaac was supposed to know about this plan. Defendant was caught off guard when David Isaac pulled out a gun and used it to hit defendant in the head. Defendant claimed his gun went off during the ensuing struggle.

In 2008, defendant was charged in a three-count information, but his jury trial proceeded on a single count of murder, with special allegations that the murder was committed during a burglary or a robbery and that defendant personally used a firearm. (Pen. Code, §§ 187, subd. (a); 190.2, subd. (a) (17); 12022.5, subd. (a).) The court denied defendant's motion to suppress his statement to police. The jury convicted defendant of first degree murder, finding the special allegations that the murder was committed during a burglary and that defendant personally used a firearm to be true. The jury found the allegation that the murder was committed during a robbery to be not true.

---

[3] The Isaacs owned a furniture store where one of David Isaac's brothers operated a jewelry counter. The store was in debt, and various relatives had lent David Isaac money in the days before the shooting.

3

Defendant was sentenced to life imprisonment without possibility of parole, plus two years on the firearm enhancement. He timely appealed.

## DISCUSSION

### I

Defendant argues his confession should have been suppressed because it was involuntary as the product of deception and implied promises of leniency. We granted his motion to augment the record on appeal with the 164-page transcript of the recorded 2006 interview, which the trial court considered when denying the motion to suppress. Since the interview was recorded and its content undisputed, we independently review the issue of voluntariness. (See *People v. Vasila* (1995) 38 Cal.App.4th 865, 873.)

Early on in the interview, the detectives falsely told defendant that the motel clerk had identified him in a photographic lineup. They showed him a fabricated lineup, on which defendant's photograph was circled, the clerk's name was signed, and the statement "This is the person that robbed me in 1986" was added. Defendant noticed that the year of the robbery on the statement was incorrect and denied participating in the motel robbery.

The ploy the detectives used with regard to the motel robbery does not render defendant's statement about the shooting involuntary. Falsely telling a suspect that he has been identified by a witness is not an objectionable tactic. (See *People v. Smith* (2007) 40 Cal.4th 483, 505, citing *Amaya-Ruiz v. Stewart* (9th Cir.1997) 121 F.3d 486, 495.) Moreover, the tactic was evidently intended to elicit a confession about the motel robbery rather than about the shooting at the Isaacs' home, about which the motel clerk knew nothing. (See *id*. at p. 506.)

Defendant made no incriminating statements about the shooting until the detectives represented that fingerprint and DNA evidence connected him to the scene and all they needed to "put a case" on him was motive. He does not argue this representation was false, and the evidence at trial indicates fingerprint and DNA evidence against defendant was available in 2006. Faced with this evidence, defendant recognized he was

4

"in a no-win situation." He argues he made incriminating statements from that point on because the detectives implied that "he would not be charged with murder if he did not intend to harm anyone" and that "if someone else had hired him, he would be less culpable and would not be prosecuted in exchange for information on that person's identity."

A confession is inadmissible if "'a person in authority makes an express or clearly implied promise of leniency or advantage for the accused which is a motivating cause of the decision to confess.'" (*People v. Tully* (2012) 54 Cal.4th 952, 985.) To determine whether a promise of leniency was made and whether it motivated the confession, we examine "'"'all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.'"'" (*Id*. at p. 986.) Pointing out a benefit that "'flows naturally from a truthful and honest course of conduct'" is proper, but promising that the defendant "'might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one,'" is not. (*People v. Cahill* (1994) 22 Cal.App.4th 296, 312 (*Cahill*), quoting *People v. Hill* (1967) 66 Cal.2d 536, 549.) The promise "'need not be expressed, but may be implied from equivocal language not otherwise made clear.'" (*Cahill,* at p. 312.)

Detective Marcia offered defendant three scenarios: that defendant had gone to the victim's house to hurt the victim; that defendant had intended to rob the victim, who got hurt in the process; or that someone hired defendant to hurt the victim. As to the last scenario, the detective stated: "And if somebody hired you, then you're a small fish. . . . [Y]ou give up the – the person, hey, then we move on." Defendant reads the phrase "we move on" as implicitly offering him immunity from prosecution. To the extent the phrase is ambiguous, other portions of the interview make clear the detectives meant that if someone else also was involved, the investigation was not over. The consequence for defendant was that he would not be the only one prosecuted. Detective Marcia's express promise that the detectives would not "put a case just on" defendant, and the question "should you go down for this all by yourself?" made that clear. The references to

5

defendant as "a small fish" or not "the right fish" could not reasonably be understood to mean defendant was not culpable at all since he was told that the forensic evidence placed him at the scene of the shooting. Detective Marcia also told defendant, "I'm not going to say that you're not culpable here . . . ." The assurance that defendant's cooperation would be "taken into consideration" was too vague to amount to a promise of leniency when no particular benefit was identified. (See *People v. Holloway* (2004) 33 Cal.4th 96, 117 ["suggesting that defendant might benefit in an unspecified manner" was not improper].)

At the time of the interview, defendant was 40 years old. His criminal history was extensive and his prison experience substantial. (See *People v. Vasila*, *supra*, 38 Cal.App.4th at p. 876 [defendant's "'age, sophistication, prior experience with the criminal justice system and emotional state'" are relevant factors].) At various times during the interview, defendant stated he understood that he was "screwed," that he would have to go to court, and that he might spend the rest of his life in prison. Under the totality of the circumstances, we cannot conclude that defendant in fact believed he was being promised immunity from prosecution, or that such a belief would have been reasonable. (See *People v. Tully*, *supra*, 54 Cal.4th at p. 986 [statement is induced by promise of leniency when inducement and statement "'are linked, as it were, by "proximate" causation'"]; *Cahill*, *supra*, 22 Cal.App.4th at p. 312 [promise that defendant "might reasonably expect" leniency is improper].)

Relying on *Cahill*, *supra*, 22 Cal.App.4th 296, defendant argues the detectives misrepresented the law of felony-murder when they implied he might be charged with manslaughter if he did not intend to harm anyone. The 18-year-old defendant in that case confessed to being present in the home of a robbery-rape-homicide victim after the interrogating officers gave a "materially misleading" overview of the law of murder that omitted felony-murder, and represented that the defendant might avoid a charge of first degree murder if he had not premeditated the crime. (*Id.* at pp. 303, 315, 316–317.) The court held the confession was involuntary, reasoning that to the young defendant "'unskilled and uncounseled in the law' the representations that premeditation was an

6

element of first degree murder 'might have offered a hope' that if defendant confessed but denied premeditation he might be cleared of the most serious charges against him." (*Id*. at p. 317, quoting *People v. Johnson* (1969) 70 Cal.2d 469, 479.)

*Cahill*, *supra*, 22 Cal.App.4th 296 is distinguishable. Before defendant made any incriminating statements, Detective Marcia explained: "If you went there to intentionally kill him, what's that? That [is] called premeditated. If you went there . . . to rob him and got into an altercation and accidentally shot him, what's that? That could be your homicide two or it could be a manslaughter or it could be anything. [¶] Or, if somebody hired you to do it or put you up to it, now we have a whole different type of crime. And we might not be with the right fish." Although Detective Marcia failed to expressly mention felony-murder, he suggested that a homicide during a robbery "could be anything," negating any implication that he was offering an exhaustive review of the law of murder. Defendant's mature age and extensive experience with the criminal justice system made it much less likely that he was materially misled by anything the detective said, and the fact that defendant did not confess he intended to rob the Isaacs suggests he was not actually misled. Moreover, later in the interview, defendant acknowledged that if he went to the Isaacs' house to rob them, that would be "murder-robbery" and "bad things" would happen, suggesting he was familiar with the felony-murder rule.

*Cahill*, *supra*, 22 Cal.App.4th 296 also is distinguishable because, until 2009, the merger doctrine applied to first degree felony-murder in the course of a burglary if the defendant's intent was to assault the homicide victim. (See *People v. Farley* (2009) 46 Cal.4th 1053, 1117, prospectively overruling *People v. Wilson* (1969) 1 Cal.3d 431.) But the merger doctrine did not necessarily apply if the defendant intended to assault someone other than the murder victim. (*People v. Farley, supra,* 46 Cal.4th at pp. 1115–1116.) If defendant's intent had been to "hurt" David Isaac, as Detective Marcia suggested, the assault would have merged with the murder, and the felony-murder rule would not have been necessary. Since there was no evidence of a robbery, defendant's admission that he was present in the Isaacs' home, by itself, would not necessarily have brought the felony murder-rule into play. The transcript of the interview does not

7

indicate it was reasonably foreseeable defendant would state he went to the Isaacs' home intending to scare David Isaac's wife. In all these respects, the case is different from *Cahill*, where there was evidence of robbery and rape, and the court concluded, "It is not plausible to suppose that a homicide investigator . . . was unaware . . . that a statement admitting defendant's presence in the house would amount to a confession of felony murder."

The vague suggestions that defendant could "help himself" because "there could be somebody else involved . . . or something could have just [gone] wrong" did not amount to promises of leniency in exchange for cooperation as they simply encouraged defendant to tell what happened without promising a particular benefit. (See *People v. Holloway*, *supra*, 33 Cal.4th at p. 116 [suggestions that killings during commission of burglary "might have been accidental or resulted from an uncontrollable fit of rage during a drunken blackout" not improper]; *People v. Bradford* (1997) 14 Cal.4th 1005,1043–1044 [suggestion killing was in "heat of passion" not improper]; *People v. Ditson* (1962) 57 Cal.2d 415, 433 [exhortations to tell truth or help oneself by revealing acts of others not improper].)

Throughout the interview, Detective Marcia also suggested he cared about defendant, would "work with" him, would not "give up on" him, and would "do the right thing." The detective apparently meant that the investigation would continue, but he did not imply any particular benefit to defendant. (See *People v. Vance* (2010) 188 Cal.App.4th 1182, 1212 [no "implied promise of leniency" where officer stated "'[w]e are here to listen and then to help you out'"].) Towards the end of the interview, the detective suggested the prosecutor was a like-minded individual and "a very close friend," who would "do what's right." But defendant already had asked what his "deal" was for cooperating, and the detective had explained he could not "give [him] that." Defendant had acknowledged he understood. Defendant also understood the detectives' job was "to detect," to not give up on the case, and to take "the bad guy off the street," rather than to help him out or not to give up on him personally. Without evidence that any particular promise of leniency reasonably motivated defendant to make incriminating

statements, the detectives' expressed sympathy, whether feigned or real, and vague promises to do right by him did not render his confession involuntary.

## II

Defendant told the detectives that David Isaac knew or was supposed to have known of the plan to scare his wife. He argues that, based on these statements, the court should have instructed the jury *sua sponte* on consensual entry and mistake of fact as defenses to burglary, and that defense counsel was ineffective in not requesting such instructions.

We review de novo defendant's claims of instructional error. (*People v. Waidla* (2000) 22 Cal.4th 690, 733.) A court's sua sponte duty to instruct on a defense arises only when the instruction is not inconsistent with the defendant's theory of the case and there is substantial evidence to support it. (*People v. Breverman* (1998) 19 Cal.4th 142, 157.) The failure to request a factually and legally unsupported instruction is not ineffective assistance of counsel. (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 836.)

Consent to burglary is an affirmative defense, available "when the owner a*ctively* invites the accused to enter, *knowing* the illegal, felonious intention in the mind of the invitee. [Citation.]" (*People v. Felix* (1994) 23 Cal.App.4th 1385, 1397–1398; *People v. Sherow* (2011) 196 Cal.App.4th 1296, 1304.) But as defendant acknowledges, under *People v. Clayton* (1998) 65 Cal. App.4th 418 (*Clayton*), a co-occupant's consent to a felonious act to be perpetrated on another occupant is not a defense to burglary. Defendant argues that ex post facto concerns preclude the retroactive application of *Clayton* to his conduct in 1989, which predated that case. An unforeseeable judicial enlargement of a criminal statute may not be applied retroactively. (*People v. Farley*, *supra*, 46 Cal.4th at p. 1122; see *People v. Morante* (1999) 20 Cal.4th 403, 431 ["If a judicial construction of a criminal statute is unexpected and indefensible by reference to the law that had been expressed prior to the conduct in issue, it must not be given retroactive effect"].) But *Clayton* did not unforeseeably enlarge the burglary statute (Pen. Code, § 459).

9

The holding in *Clayton* was applied retroactively to affirm the defendant's burglary conviction, which was based on his entry into a house to kill the victim at her husband's behest. (*Clayton*, *supra*, 65 Cal. App.4th at p. 420.) The Court of Appeal in that case relied on *People v. Gauze* (1975) 15 Cal.3d 709 (*Gauze*). There, the Supreme Court explained that burglary laws are primarily aimed at "the dangers to personal safety 'created by the usual burglary situation'— the danger that the intruder will harm the occupant in attempting to gain entry to perpetrate the intended crime or in attempting to escape, or that the occupant will react in anger or panic and thus create more violence." (*Clayton*, at pp. 421, 423, quoting *Gauze*, at p. 715.) The defendant in *Gauze* had entered his own home intending to assault his roommate, but the court concluded his entry into the home, by itself, did not engender the panic, emotional distress, or violence of the usual burglary situation. (*Gauze,* at pp. 715–716.)

*Clayton*, *supra*, 65 Cal. App.4th 418, 420–421 distinguished the facts in *Gauze* and another case, *People v. Superior Court (Granillo)* (1988) 205 Cal.App.3d 1478, where a defendant entered an apartment possessed only by the person who had consented to his entry. The *Clayton* court concluded that, in contrast, an occupant's consent to a third person's entry to perpetrate a felony on an unsuspecting co-occupant creates precisely the independent danger to personal safety that *Gauze*, *supra*, 15 Cal.3d 709, 715 reasoned was inherent in the usual burglary situation. (*Clayton*, at p. 423.) Since the *Clayton* holding relied on the reasoning in *Gauze,* it cannot be said to have been unexpected or indefensible, and its retroactive application to defendant's conduct does not violate due process. (See *People v. Morante*, *supra*, 20 Cal.4th at p. 431.)

Whether or not defendant's confession was substantial evidence that David Isaac consented to defendant's armed entry to scare Mrs. Isaac, *Clayton*, *supra*, 65 Cal. App.4th 418 precludes a consent defense based on one occupant's consent to a third person's entry with intent to perpetrate a felony on a co-occupant. Defendant was not entitled to a consent defense under the circumstances. Nor was he entitled to a mistake of fact defense based on a mistaken belief that David Isaac consented to his entry. The mistake of fact defense "requires, at a minimum, an actual belief 'in the existence of

10

circumstances, which, if true, would make the act with which the person is charged an *innocent* act . . . .' [Citations.]" (*People v. Lawson* (2013) 215 Cal.App.4th 108, 115, italics added.) A mistake of fact is not a defense to an unlawful act where defendant's actions would still be unlawful if the facts had been as he believed them to be. (See *People v. Watkins* (1992) 2 Cal.App.4th 589, 594.) Under *Clayton*, defendant's entry would still be unlawful even had David Isaac consented to it.

Defendant was not entitled to instructions on the defenses of consent and mistake of fact. Therefore, counsel's failure to request these instructions was not ineffective assistance, and the court's failure to give them sua sponte was not error.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EPSTEIN, P. J.

We concur:


WILLHITE, J.


SUZUKAWA, J.

11