**Tammy R. GARVIN, Petitioner,**

v.

**Teena FARMON, Respondent.**

**No. C 99–01847 WHA.**

United States District Court, N.D. California.

Dec. 20, 1999.

Tammy Rochelle Garvin, Chowchilla, CA, pro se.

Bruce E. Cohen, Berkeley, CA, for Tammy Rochelle Garvin

Bill Lockyer, David P. Druliner, Ronald A. Bass, Ronald S. Matthias, Martin S. Kaye, CA State Attorney General's Office, San Francisco, CA, for Teena Farmon.

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

ALSUP, District Judge.

### INTRODUCTION

In this federal habeas case brought by a state prisoner, the issue concerns the voluntariness of a confession obtained after detectives falsely suggested to the suspect that she could avoid a murder prosecution by confessing to robbery and urged her to "cooperate" before she consulted with a lawyer. The state courts condemned this tactic but held its coercive force had attenuated by the time of the non-counseled confession, three days later, a confession used to convict petitioner of murder. In

this habeas proceedings, petitioner makes a powerful case of coercion and involuntariness. Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), however, federal district courts may no longer engage in *de novo* review of the voluntariness of confessions. Under the deferential review required by AEDPA, the petition must be denied.[1]

## STATEMENT

Petitioner Tammy Garvin, then a 32-year old prostitute, knew the murder victim, Rolf Neumeister. She had worked for him as a waitress and had maintained an intermittent sexual relationship with him. Knowing where Neumeister kept the restaurant's proceeds, she suggested to Lucien Lemelle, her lover, that Neumeister would be easy to rob. They drove to Neumeister's after hours. She asked Neumeister to open the door. When he did, Lemelle barged in and robbed Neumeister. Petitioner claims she sat in the car while Lemelle killed Neumeister. Eventually petitioner turned herself in to the police in Campbell, California.

On March 15, 1991, she was interrogated by Detectives Kern and Lee. She was first given her *Miranda* rights. She repeatedly asked for counsel and said she had nothing to say. The detectives disregarded this and pressured her to talk. They made many representations to her about what Lemelle (also under arrest) was saying and tried to persuade her that she was headed for a murder charge while Lemelle would be held only as an accessory. Calling it "egregious" misconduct, the state court of appeal found the detectives repeatedly invited her to admit to robbery and materially understated the legal consequences of doing so, conveniently leaving out the felony-murder rule:

> The officers suggested to appellant that if she did not cooperate she would be

prosecuted for murder with special circumstances and that Lemelle would be prosecuted merely as an accessory. They told her, falsely, that Lemelle had given them a statement implicating her as the "heavy" and suggested that she would vastly improve her legal situation if she admitted participation—either in the robbery but not the killing or by admitting the killing but denying it was premeditated. Such an admission, they stated, would "take[ ] away the special circumstances." Their account of the law of murder was materially misleading in omitting the felony-murder doctrine.

> They claimed to have found physical evidence (fingerprints and skin from under Neumeister's fingernails) which they did not have. They pleaded with appellant not to "take the fall" but to tell them who did it and "give [them] something to work with," let them "work for" her and "get [her] out of jail." They told her talking to them could only get her "out of trouble or lessen the trouble" she was in.

> They told appellant Lemelle's family would get him "a good attorney," whereas she would not "have the means to get past the Public Defender's Office. Which means you're going to have to help yourself, cause there ain't gonna be anybody out there helping you." Interspersed throughout were "reminders" that nothing appellant said could be used against her in court.

> The first interrogation ended after a short break when appellant insisted she had not slept for three days and needed to sleep, but that she would call. Kern left his business card with appellant.

DCA Opinion at 7 (Aug. 27, 1999).[2]

The transcript of that interview includes passage after passage wherein the detec-

---

1. This petition was filed after April 24, 1996, and is thus governed by 28 U.S.C. 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996. *Lindh v. Murphy,* 521 U.S. 320, 336–38, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

2. "DCA Opinion" refers to the slip opinion of the state court of appeal (Exh. F to petition for writ of habeas corpus).

tives misinformed petitioner concerning the legal consequences of confessing to robbery:

Lee: You know that we can prove whether or not you were there. Okay. That's a mute [sic, moot] point. Number one, what we need to know is are you going to take the fall all by yourself. And number two, why did the old fart have to die for his money. Why didn't you just rip him off, you've done it before and you've gotten away with it. He didn't have to die this time.

Kern: His checks.

Lee: That's something I would like to know.

Kern: Maybe it didn't even start off to be that, you know. Maybe it was just a simple rip off. Maybe he went sideways.

Lee: Maybe he went sideways. Came after you? Came after Lou?

Kern: Yeah, if that's the case . . .

Lee: That explains things, that answers questions.

Kern: If that's the case, then that takes away the special circumstances. To go there with the intent just to steal.

Lee: And it turned to shit.

Kern: That's two different things. I don't know if you want to help yourself in just that area. Cause otherwise everybody is going to believe that you went there to kill him to take his money. Okay. That's what everybody is going to believe.

\*    \*    \*    \*    \*    \*

Lee: He's gonna come out of this smelling like a rose more than likely. If he cooperates the way he um . . .

Kern: Has so far.

Lee: He indicated he wants to . . .

Garvin: Lou sounds so negative, come on.

Kern: He's happy with his role as an accessory, I'll tell you that. That beats, that beats the other option, which is the one you're in. He's not looking to join you as a co-defendant. He's very content with an accessory

role versus a primary role, which is why he has bail and you don't. Even though his bail is outrageous, but that's why he's got bail and why you don't. And he was not booked for murder.

Garvin: What was he arrested for?

Kern: Accessory, which basically means aiding and abetting you. But not murder.

\*    \*    \*    \*    \*    \*

Kern: It's murder this time with a capital offense possibly hanging over your head because of the special circumstances. Take a couple of minutes and just process all that. (Long pause.) You have a tub that was scoured, but not all the way. (Short pause.) And then there's the bathroom door.

\*    \*    \*    \*    \*    \*

Lee: The other thing is you know this is half of the evidence we've got against you. We talked about that it's your fault and you can take the whole rap yourself. Whether you owe anybody that much. Are you willing to face a capital offense as opposed to just the normal bullshit.

Kern: Uhm.

Garvin: I didn't kill Rolf. (Crying.)

Kern: Well then . . .

Lee: But you were there.

Garvin: I did not kill Rolf.

\*    \*    \*    \*    \*    \*

Kern: Who did? What happened then if you didn't do it? Even if you went there to rip him off, what happened? Theft is one thing. In this case, it's no big thing.

Tr. of First Interrogation of Tammy Garvin, Mar. 15, 1991, 9–19 (reproduced at Augmented Clerk's Transcript ("ACT") 418–37).

In other words, the detectives suggested that by confessing to robbery, she could avoid a murder charge. The police point-

ed out, as shown, that she was facing a "capital" charge. At the suppression hearing, Detective Kern testified that he knew this was a false distinction under the felony-murder rule (Tr. of Mo. to Suppress, Apr. 22, 1994 at 61). Detective Kern testified that "it was his practice intentionally to violate the constitutional rights of suspects when he 'wanted to develop more evidence.'" DCA Opinion at 11.

The detectives, moreover, urged that insisting on the right to counsel would only worsen her situation:

> Lee: Well, when you get your attorney, if you want to talk to us, you call us, okay. *Cause this is the only time we are going to ask to talk to you.* Okay. And you can't get yourself in trouble.
>
> Kern: All you can do is get yourself out of trouble or lessen the trouble you're in. Yeah, cause you're going to have to explain the scratches you have on your face too.

(Tr. of First Interrogation, cited in full above, at 8.)

\* \* \* \* \* \*

> Kern: Well if you at least want the District Attorney to have some kind of a, some kind of a[sic] idea, for a lack of a better word, of how you perceived the events took place. Your level of cooperativeness, because there's two suspects, you and Lou. If you want him to have some kind of a yardstick that he can make decisions on, base the decision on, other than what the physical evidence tells him. *Now is the opportunity to do that.* You'll hear it on this tape as you will, as your attorney will. Again, reminding you that none of what you could say or do say, if you do, can be used against you. *Now is the time to do it because there won't be another opportunity with us or the District Attorney.* He can charge special circumstances because of the robbery.

(*Id.* at 11–12.)

\* \* \* \* \* \*

> Lee: And (Lou's) going to have a good attorney, cause I know his parents are

gonna put everything up that they need to get him a good attorney, and they're gonna make sure he becomes a witness as opposed to a co-defendant. And I don't think you're going to have the means to get pass [sic] the Public Defender's Office. *Which means you're going to have to help yourself, cause there ain't gonna be anybody out there helping you.*

(*Id.* at 13.)

\* \* \* \* \* \*

> Kern: Alright, then you're gonna have to help, you're gonna have to help us help you. Do you understand? It's not, it's not a ... Tammy you don't have to be a rocket scientist to figure this out. *We can't help you and you can't help yourself unless you tell us what happened that night.*

(*Id.* at 19) (all emphasis added).

Tired, petitioner asked to terminate the interview. She made no incriminating statement on that occasion. She said that "when I wake up ... I'll call you."

Petitioner stayed in maximum security over the weekend. She slept little and cried at times. She could use the phone between 1:00 a.m. and 2:00 a.m. She had no counsel or other visitors. On Monday afternoon (the 18th), she was arraigned. The complaint charged her with murder and Lemelle only as an accessory, just as anticipated by the detectives. The state court of appeal stated:

> She [the deputy public defender] received the complaint and waived arraignment while announcing that the public defender's office represented Lemelle and would declare a conflict in appellant's case. The matter was set for entry of a plea and identification of counsel three days later, at the same time as Lemelle's arraignment. As Kern had foretold, the complaint charged appellant with murder and Lemelle with being an accessory. Kern was present in court and made eye contact with appellant.

DCA Opinion at 8. Because the public defender represented Lemelle, a conflict was declared and counsel was not yet appointed for petitioner.

Back in jail, petitioner promptly sent word via a friend that she wanted to see Detective Kern. He came to the jail and began a taped interview at 5:05 p.m. He again advised her of her *Miranda* rights and asked her if her request to see him was of her "own free will," to which she said yes (Tr. of Second Interrogation of Tammy Garvin, Mar. 18, 1994, at ACT 247–337). She then confessed. During the confession, petitioner carried forward the distinction between robbery and murder (see Petition ¶¶ 41–45). The state court of appeal summarized her confession:

> Appellant admitted going with Lemelle to the restaurant to rob Neumeister, but aside from getting Neumeister to open the door, she denied any involvement. She stated she waited in the car, but when it "took too long," she went back to the restaurant. The door was open. She went inside; there was blood all over; and she saw Lemelle on top of Neumeister in the bedroom. Neumeister said, "Jessica, why? I was so good to you." She saw the money bag, took it, and she and Lemelle left. She repeatedly denied involvement in any struggle or assault on Neumeister.

DCA Opinion at 9.

The trial court suppressed the March 15 statement, although there was little to suppress from that occasion, but not the March 18 confession. Based thereon, petitioner was convicted of first-degree murder (with special circumstances) and was sentenced to life with no possibility of parole.[3]

The state court of appeal held that the police had engaged in a purposeful, persistent and glaring violation of petitioner's Fifth Amendment rights. DCA Opinion at 10–12. The first interrogation, which had been totally suppressed, was not the issue. The problem concerned the second interrogation where the confession occurred.

The state court of appeal posed the issue as follows:

> The question for us is whether the misconduct made the subsequent statement involuntary. We must determine whether an effect carried forward from Kern's and Lee's practices which included:
> A. Disregarding appellant's repeated requests for counsel (*People v. McClary* (1977), 20 Cal.3d 218, 226, 142 Cal.Rptr. 163, 571 P.2d 620);
> B. Giving an account of the law of murder that was materially misleading in omitting mention of the felony-murder rule (*People v. Cahill* (1994), 22 Cal. App.4th 296, 315, 28 Cal.Rptr.2d 1) or special circumstance felony-murder (*People v. Pock* (1993), 19 Cal.App.4th 1263, 1274–1275, 23 Cal.Rptr.2d 900);
> C. Suggesting that a failure to cooperate would result in a capital prosecution (*People v. Jimenez* (1978), 21 Cal.3d 595, 613, 147 Cal.Rptr. 172, 580 P.2d 672) and implying that appellant could avoid a charge of murder with special circumstances if she admitted that she just went to the restaurant to steal. The latter scenario is exactly what appellant admitted in the second interview which was tantamount to a confession of felony-murder (*People v. Cahill, supra,* 22 Cal.App.4th at pp. 314, 315, 28 Cal. Rptr.2d 1);
> D. Promising leniency via an array of tactics (*People v. Cahill, supra,* 22 Cal. App.4th at pp. 311–316, 28 Cal.Rptr.2d 1), including: strongly implying that appellant could reverse her and Lemelle's positions if the District Attorney had her statement, urging her to tell him and Lee what happened so they would work "for" her and prove her version of events (*id.* at p. 311, 28 Cal.Rptr.2d 1), suggesting that her statement could benefit her by changing her role from principal to accessory (*People v. McClary, supra,* 20 Cal.3d at p. 229, 142 Cal.Rptr. 163, 571 P.2d 620), falsely

---

3. Lemelle was tried subsequently and acquitted.

**1088**

claiming they had a statement from Lemelle placing the onus on appellant and that they had physical evidence that did not, in fact, exist (*People v. Cahill, supra,* 22 Cal.App.4th at p. 315, 28 Cal. Rptr.2d 1)["[e]ven collateral deception is material if it is allied with matters amounting to a false promise of leniency"]; suggesting that if appellant did not make a statement, the authorities would have no choice but to believe Lemelle (*People v. Cahill, supra,* 22 Cal.App.4th at p. 315, 28 Cal.Rptr.2d 1); and that the jury would regard her as a liar ("[y]our denials are going to just look so bad. So bad[ ]") [footnote omitted] (*People v. Jimenez, supra,* 21 Cal.3d at pp. 610–612, 147 Cal.Rptr. 172, 580 P.2d 672); E. "[R]emind[ing]" her over and over, untruthfully, that whatever she said could not be used against her at trial (*People v. May* (1988), 44 Cal.3d 309, 315, 320, 243 Cal.Rptr. 369, 748 P.2d 307); and finally, F. "[D]emeaning the pretrial role of counsel" by telling appellant that without "the means to get pass [sic] the Public Defender's Office[,] . . . you're going to have to help yourself, cause there ain't gonna be anybody out there helping you." The implication of Kern's advice is "inconsistent with *Miranda's* stated purpose of making 'the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest.' [Citation.]" (*Collazo v. Estelle* (9th Cir.1991), 940 F.2d 411, 418.)

DCA Opinion at 12.

The state court of appeal further held, given the misconduct on March 15, that the prosecution had the burden to prove that the challenged confession on March 18 was voluntary and not the result of any form of compulsion or promise of reward. To assess that issue, the court then turned to consideration of "attenuating factors" or "dissipation," stating:

In determining the voluntariness of a subsequent confession, we consider the age, sophistication, prior experience with the criminal justice system, and emotional state of the accused (*People v. Vasila* (1995), 38 Cal.App.4th 865, 876, 45 Cal.Rptr.2d 355) as well as "whether (1) there was a break in the stream of events sufficient to insulate the statement from the effect of the prior coercion, (2) it can be inferred that the coercive practices had a continuing effect that touched the subsequent statement, (3) the passage of time, a change in the location of the interrogation, or a change in the identity of the interrogators interrupted the effect of the coercion, and [whether] (4) the conditions that would have precluded the use of a first statement ['particularly, the purpose and flagrancy of the official misconduct' (*Brown v. Illinois,* 422 U.S. 590, 604, 95 S.Ct. 2254, 45 L.Ed.2d 416) ] had been removed." (*Collazo v. Estelle, supra,* 940 F.2d at p. 421.)

DCA Opinion at 16.

The court found petitioner was wise in the ways of law enforcement, a veteran of the criminal justice system with a 29–page rap-sheet and a prior prison term. She had skillfully negotiated her surrender. She had stood on her rights during the first session and remained virtually silent despite the police misconduct, showing resolve, the court said, and an ability to waive or not to, as she wished. She had been the one, not the detectives, to initiate the second interview with Detective Kern. And, she acknowledged that she was confessing and waiving her Fifth Amendment rights voluntarily. No promises had been made, she said (Tr. Second Interrogation, cited in full above, at 3).

Petitioner is now incarcerated at the Central California Women's Facility in Chowchilla, California. Petitioner filed this petition for writ of habeas corpus on April 13, 1999. Oral argument was on November 10, 1999.

## ANALYSIS

The central vice of the misconduct was to suggest that petitioner could avoid a capital murder charge by confessing to

robbery, falsely understating the *legal* consequences of doing so, while simultaneously discouraging her from exercising her right to legal counsel. This prevented her from learning about the felony-murder rule and from learning that confessing to robbery was the same as confessing to murder. The misconduct came after petitioner repeatedly insisted on a lawyer and on making no statement beforehand.

■ All of the state judges in this case condemned the police tactic and were unanimous that any statements taken at the first interview were inadmissible. Once petitioner asked for counsel, all questioning should have ceased. *Edwards v. Arizona,* 451 U.S. 477, 484, 101 S.Ct. 1880 (1981). Had *Edwards* been honored and had petitioner herself voluntarily initiated the second interview and knowingly, intelligently and freely waived counsel, then she could have been properly interviewed. *Ibid.* On the other hand, if coercive pressure was applied at the first encounter, as it undisputedly was, then the prosecution had to prove that the second interview was not the product of that coercion, even though the accused initiated the second interview. The state court of appeal so held correctly. *Brown v. Illinois,* 422 at 604, 95 S.Ct. 2254; *Alderman v. United States,* 394 U.S. 165, 183, 89 S.Ct. 961 (1969).[4]

■ The state courts were right to condemn the police tactics as coercive. To be sure, the Supreme Court has held that some types of police deception are permissible, such as falsely stating that a co-defendant has turned state's evidence. *Frazier v. Cupp,* 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), or installing government agents as cellmates to elicit statements, *Illinois v. Perkins,* 496 U.S. 292, 296–97, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990). And, merely because an accused is unaware of the potential adverse consequences of his statements does not invalidate a confession. *Califor-*

nia *v. Beheler,* 463 U.S. 1121, 1125–26 n. 3, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). Nor do the police have to divulge their ultimate areas of suspicion to a *Miranda*-warned suspect. *Colorado v. Spring,* 479 U.S. 564, 575–577, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987).

Certain affirmative misrepresentations, however, have been held by the Supreme Court to constitute unconstitutional deception and coercion:

> In certain circumstances, the Court has found affirmative misrepresentations by the police sufficient to invalidate a suspect's waiver of the Fifth Amendment privilege. *See, e.g., Lynumn v. Illinois,* 372 U.S. 528, [83 S.Ct. 917, 9 L.Ed.2d 922] (1963) (misrepresentation by police officers that a suspect would be deprived of state financial aid for her dependent child if she failed to cooperate with authorities rendered the subsequent confession involuntary); *Spano v. New York,* 360 U.S. 315, [79 S.Ct. 1202, 3 L.Ed.2d 1265] (1959) (misrepresentation by the suspect's friend that the friend would lose his job as a police officer if the suspect failed to cooperate rendered his statement involuntary).

*Id.* at 576 n. 8, 107 S.Ct. 851. Although no decision has been found in which the affirmative misrepresentation was, as here, an intentional, false and material understatement concerning the legal consequences of a confession suggested by the police, it seems quite clear that such conduct is as coercive as the affirmative misrepresentations in *Lynumn* and *Spano.* Were it otherwise, the police could trick many unrepresented suspects into making admissions in order to avoid the threat of a murder prosecution. As early as 1897, the Supreme Court has held:

> The test is whether the confession was "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence."

---

4. Although the state court of appeal mainly relied on state law authorities, it held that that conduct violated the Fifth Amendment.

DCA Opinion at 11. *See Henry v. Kernan,* 197 F.3d 1021 (9th Cir.1999), and *Collazo v. Estelle,* 940 F.2d 411 (9th Cir.1991) (*en banc*).

*Bram v. United States,* 168 U.S. 532, 542–43, 18 S.Ct. 183, 42 L.Ed. 568 (1897), approved in *Brady v. United States,* 397 U.S. 742, 749–50, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976). The "improper influence" here was falsely suggesting to the accused that she could avoid a murder prosecution by confessing to robbery, all the while pressuring her to talk before she had counsel. These were "circumstances calculated to undermine the suspect's ability to exercise free will." *Oregon v. Elstad,* 470 U.S. 298, 309, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

\*　　\*　　\*　　\*　　\*　　\*

Had petitioner confessed on March 15, this habeas proceeding would almost certainly never have arisen, for the confession would plainly have been coerced and suppressed. *See Collazo v. Estelle,* 940 F.2d 411 (9th Cir.1991) (*en banc*); *Henry v. Kernan,* 197 F.3d 1021 (9th Cir.). The difficulty is that three days passed before the confession. The question, then, is whether the initial misconduct, although it did not achieve the prize immediately, must be deemed to have undermined the suspect's free will and induced the subsequent confession. Most apt are decisions involving coercive interrogations followed by later confessions. One of the earliest such Supreme Court cases was *Lyons v. Oklahoma,* 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481 (1944), holding that the effect of earlier coercive questioning had dissipated by the time of the confession later admitted in evidence. The central inquiry was the extent of "the continuing effect of the coercive practices." *Id.* at 602, 64 S.Ct. 1208. The continuing effect was broken in *Lyons* by a change of location, change of supervising custodian, change in interviewers (from a sheriff to a warden with whom the accused was acquainted). These changed circumstances, the Court held, attenuated the prior coercion.

On the other hand, *Clewis v. Texas,* 386 U.S. 707, 711, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967), held a confession involuntary based on a lack of warnings, a long period of custody, a prolonged interrogation punctuated by a trip to the gravesite and several polygraph tests, and a police interrogation intended not merely to secure information but to elicit a signed confession to the police theory of the case. There was a "continuing effect"—"no break in the stream of events ... sufficient to insulate the statement from the effect of all that went before." *Id.* at 710, 87 S.Ct. 1338. *See, generally, United States v. Patterson,* 812 F.2d 1188, 1192 (9th Cir.1987).

■ The "stream of events," the Court has held, can be interrupted by *Miranda* warnings. *Cf. Oregon v. Elstad,* 470 U.S. 298, 310, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985); *Clewis,* at 711, 87 S.Ct. 1338. Yet, even warnings, although important, may not always suffice. In *Westover v. United States,* 384 U.S. 494, 16 L.Ed.2d 694 (1966), the Supreme Court held that even subsequent warnings could not overcome the coercive effect of prior unwarned in-custody interrogation in the same location with no break in the interrogation process.

Finally, the flagrancy of the coercion matters. In *Brown v. Illinois,* the Supreme Court ended its list of attenuation factors with: "and, particularly, the purpose and flagrancy of the official misconduct...." 422 U.S. at 604, 95 S.Ct. 2254. This, too, had been a factor in *Clewis,* where the Court stated, "[T]he police testimony makes it clear that the interrogation was not intended merely to secure information, but was specifically designed to elicit a signed statement of the 'truth'—and 'the police view of the truth' was made clear to petitioner." 386 U.S. at 711–12, 87 S.Ct. 1338.[5]

---

**5.** *Brown* involved an illegal arrest followed by a murder confession. The initial wrong was a Fourth Amendment violation. That wrong could not be automatically washed away, the Court held, merely because the confession was preceded by *Miranda* warnings, admonitions meant to protect the Fifth Amendment privilege against self-incrimination. Even a voluntary confession, the Court stressed, might never have occurred but for the illegal

All of these factors must be considered without any particular weighting under the "totality of the circumstances" test. *Clewis,* 386 U.S. at 708, 87 S.Ct. 1338. Once coercion is found, as here, the burden shifts to the prosecution to overcome a presumption of taint, as the state court of appeal held. *Brown v. Illinois,* 422 U.S. at 604, 95 S.Ct. 2254.

\*   \*   \*   \*   \*   \*

In the present case, some of the coercive elements of the Friday interrogation attenuated before the confession three days later. *First,* although the detectives had originally told petitioner—untruthfully—"that whatever she said could not be used against her at trial" (DCA Opinion at 13), that problem was cured by the truthful admonition to her at the outset of the second interview. And, the issue of implied leniency promises faded with the subsequent acknowledgment by petitioner that no "promises" had been made to her.

On the other hand, the more virulent violations of the Fifth Amendment by the police were not so easily cured. These were:

- Giving petitioner an account of the law of murder that was materially misleading in omitting mention of the felony-murder rule;

- Suggesting that a failure to cooperate would result in a capital prosecution and implying that the very type of confession (to robbery) ultimately given could avoid a charge of murder;

- Demeaning the pretrial role of counsel and urging petitioner to "cooperate now" without the benefit of counsel.

These factors loomed as large on Monday as they had on Friday. The detectives

had set a trap illuminating a false way out for petitioner. The pressure was increased on Monday, at the arraignment, when she learned that the charges unfolded just as the detectives had foretold—she was charged with murder and Lemelle was charged merely as an accessory. Detective Kern was there in court to make eye contact, reminding her of all that had gone before and his evident control over events. Nothing said or done prior to the confession weakened the "continuing effect" of the trap. The "purpose and flagrancy" of the official misconduct was egregious, as the state court of appeal observed. Detective Kern testified that it was his practice to violate the constitutional rights of suspects when he wanted to obtain information. The detectives intended to violate petitioner's rights and knew they were doing so. They obtained the precise confession they intended to get. All of these coercive factors went uncured and militated against admissibility.

In its attenuation analysis, the state court of appeal emphasized that petitioner was "profoundly" affected by the murder charge and that she sought leniency: "Her decision was made for a rational and self-interested purpose: leniency." The court noted that petitioner emphasized throughout the Monday interview: "I need that murder off of me, off of me . . . ." It seems true that petitioner sought leniency in the sense that she sought to avoid a murder charge but she sought to do so by confessing to robbery. This factor actually cuts in the direction opposite from that argued by the state court. The trap set by the police was to lead the accused to believe that more lenient treatment was available

---

arrest (*id.* at 603). Thus, the voluntariness of the confession was a "threshold" issue, to be followed by a separate attenuation analysis based on the Fourth Amendment violation. In the present case, there was no Fourth Amendment violation. Petitioner turned herself in. Rather, the misconduct was a Fifth Amendment violation, although no confession emerged until three days after the coercion. At first blush, one might view the issue solely in terms of the voluntariness of the confession

in light of all that had gone before under the "totality of the circumstances" test. Alternatively, one might view the issue in terms of a constitutional violation followed by the question of attenuation, *i.e.,* was the confession the fruit of the poisonous tree. Under both lines of cases, however, the factors considered seem to be the same. The Ninth Circuit has clearly condensed the two issues into one inquiry. *See Collazo v. Estelle,* 940 F.2d 411, 421 (9th Cir.1991).

by confessing to robbery—an illusion, of course, as the subsequent murder conviction demonstrates. Petitioner was pressured, based on the false statement of the law, to seek to take away the murder charge by confessing to robbery, exactly as the detectives had suggested. This Court concludes that the pursuit of leniency, in the circumstances of this case, demonstrates coercion, not voluntariness.

The "coup de grace," said the state court of appeal, was a re-administration of *Miranda* before the confession. To be sure, petitioner was told again that anything she said could be used against her. But someone in her position, based on the false representation of the legal consequences of the very confession she did give, would have expected the confession to be used against her in a robbery prosecution, not a murder prosecution. The accused's objective was to avoid the murder charges ("I need that murder off of me, off of me"). As the state court of appeal elsewhere noted, "Kern's re-advisement of *Miranda* did not include the warning that appellant should not rely on any promises, *representations of the law,* or implications of lenient treatment made in the earlier interview." DCA Opinion at 21 (emphasis added). The trap set by the police was *Miranda*-proof, *i.e.,* those warnings did not defuse the trap. *See Westover v. United States,* 384 U.S. at 494, 86 S.Ct. 1602 (1966).

▪ The coercion/voluntariness inquiry is objective, not subjective. It is more important objectively to assess the totality of the circumstances under which the confession was made to gauge its likely effect on someone like the accused than to subjectively assess whether the specific suspect did or did not succumb. Judge Kozinski summarized this requirement as follows:

> The Supreme Court has told us that voluntariness is not merely a fact-bound question whether this particular sus-

pect's confession is the product of coercion, but also a legal question about whether the techniques the police used were tolerable. As the Court noted in *Miller v. Fenton,* 474 U.S. 104, 116, 106 S.Ct. 445, 452, 88 L.Ed.2d 405 (1985), "the admissibility of a confession turns as much on whether the techniques for extracting the statement, as applied to this suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne." The question before us, then, is whether the technique used here risks overcoming the will of the run-of-the-mill suspect, even if it did not overcome the will of this particular suspect.

*Collazo v. Estelle,* 940 F.2d 411, 426 (9th Cir.1991) (concurring opinion).[6]

In sum, the prosecution had the burden to demonstrate attenuation. Based on the historical facts set forth by the state courts, petitioner has presented a powerful case, at least under a *de novo* standard of review, that the prosecution did not carry its burden. This brings us to the crux of the matter and the question whether a federal district court may any longer apply a *de novo* standard of review in habeas cases.

\*     \*     \*     \*     \*     \*

Prior to the Antiterrorism and Effective Death Penalty Act of 1996, whether a state prisoner's confession was voluntary or not was a question of mixed law and fact to be reviewed *de novo* by a federal district court. *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). AEDPA, however, amended the habeas jurisdiction of the district courts to require not only deference to state court findings of fact, which was already required by Section 2254, but also to require, as a further limitation, deference to state court determinations of federal constitutional law. In

**6.** *Collazo* is close on the facts to the present case, the primary difference being a three-day lapse rather than a three-hour lapse. *Collazo* would arguably be controlling were this case not subject to AEDPA.

relevant part, Section 2254(d)(1) now reads:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

This provision has limited the extent to which even the jurisprudence of our own circuit may be consulted. As the Ninth Circuit has stated:

This court, however, has unequivocally held that, because of the 1996 AEDPA amendments, it is no longer permitted to apply its own jurisprudence when entertaining § 2254 habeas petitions, and must look exclusively to Supreme Court caselaw in reviewing a petitioner's claim. *See Moore v. Calderon,* 108 F.3d 261, 264 (9th Cir.1997) ("[a] state court decision may not be overturned on habeas review, for example, *because of a conflict with Ninth Circuit based law, but rather a writ may issue only when the state court decision is 'contrary to, or involved an unreasonable application of,' an authoritative decision of the Supreme Court")* (quoting *Childress v. Johnson,* 103 F.3d 1221, 1224–26 (5th Cir.1997)) [emphasis added].

*Duhaime v. Ducharme,* 193 F.3d 1126 (9th Cir.1999).

Although the Ninth Circuit has not yet addressed the impact of AEDPA on the standard of review of the voluntariness of a confession, the Fifth Circuit has held that AEDPA has "altered dramatically" the *de novo* standard of review established in *Miller v. Fenton* before AEDPA. *Car-*

*ter v. Johnson,* 110 F.3d 1098, 1108 (5th Cir.1997). This conclusion seems inescapable, given the statutory language.

■■■ In short, *de novo* review of any claim adjudicated on the merits in state court is now impermissible under AEDPA. *Delgado v. Lewis,* 181 F.3d 1087, 1091 n. 3 (9th Cir.1999). Review is limited to whether the state determination of voluntariness was (i) an unreasonable application (or contrary to), (ii) clearly established federal law, (iii) as determined by the Supreme Court. The Ninth Circuit holds that "clearly established" law under AEDPA is not limited to Supreme Court precedent factually on point. Rather, it is enough to demonstrate that a state court ruling of law defies the "force and logic" of the Supreme Court's decisions. *Ibid.; Davis v. Kramer,* 167 F.3d 494, 500 (9th Cir.1999).

The force and logic of the Supreme Court's caselaw, set forth above, reduces to a "totality of the circumstances" test on coercion. While the Supreme Court has permitted some police deceptions and not others, it has not addressed the specific police tactic here at issue. The state court here held that such conduct, at least in combination with other misconduct, was inherently coercive under the Fifth Amendment and that conclusion seems clearly correct under the force and logic of the Supreme Court's caselaw.

■■■ Where, however, as here, there is a passage of time between the coercion and the confession, the Supreme Court requires a balancing of attenuation factors. The state court of appeal recognized the correct set of factors, as demonstrated by its opinion quoted above. In the present case, some of those factors support voluntariness. There was a three-day passage of time. It was petitioner, not any detective, who initiated the second interview.[7]

---

7. In *Collazo,* the passage of time was three hours and the court of appeals held that, although the suspect initiated the second interview, it was really the "delayed product" of the earlier coercion. 940 F.2d at 423. The

same argument could be made here. No Supreme Court decision, however, establishes that a request by a suspect to talk to police in circumstances like those involved here must be deemed to be police-initiated.

Petitioner was warned again. She stated that she called for Detective Kern of her own free will. She stated that no promises had been made to her. She was aware that the process was underway to appoint a lawyer for her. She was a veteran of the criminal justice system, hardened to the task of standing up to the police. There is no evidence of mental impairment.

In light of these factors, honest and reasonable differences of opinion may legitimately co-exist over how the factors weigh in the balance and over whether or not confessions in such circumstances should be deemed coerced, even if the prosecution has the burden of proof. It is true that this Court disagrees with at least two elements of the state court of appeal's analysis, namely whether the *Miranda* warnings defused the police trap and the significance of petitioner's desire to obtain leniency. But even taking those adjustments into account, the caselaw is not so clearly established that one could say that the force and logic of the Supreme Court's jurisprudence dictated suppression of the confession or that the state court's balance of attenuation factors was unreasonable. The state decision was thus not contrary to the force and logic of "clearly established" Supreme Court caselaw. Nor was it an unreasonable application of the Supreme Court's jurisprudence.

For many years, the federal district courts provided every person convicted in a state court a right of *de novo* review to insure that their convictions comported with certain federal constitutional rights, a role that the Supreme Court simply could not perform on direct review, given its workload. In AEDPA, Congress sought to restrict that historic function of the district courts and to entrust the protection of federal constitutional rights, more exclusively, to state judges. Whether or not that was wise policy is for others to decide. This is a case in which AEDPA

makes a difference. The petition for habeas corpus must be DENIED.[8]

**IT IS SO ORDERED.**

---

8. The only other claim in the petition is that the prosecution used an inconsistent theory of the case in its separate prosecution of Lemelle. Petitioner, however, has not shown that the differing theories of the case are in conflict with or constituted an unreasonable application of clearly-established law by the Supreme Court.