Filed 8/20/14  P. v. Ramos CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>EDWIN U. RAMOS,<br><br>    Defendant and Appellant. | A135813<br><br>(City & County of San Francisco<br>Super. Ct. No. 209244) |

Defendant Edwin U. Ramos appeals his conviction of three counts of first degree murder, one count of attempted murder, and one count of participation in a criminal street gang. On appeal, he contends the court erred by admitting the following evidence at trial: (1) defendant's allegedly involuntary incriminating statements made during extended police interrogation, (2) the lay opinion of the investigating police officer that defendant, rather than an accomplice, was the shooter, and (3) excessive, cumulative and prejudicial testimony about defendant's membership and participation in a criminal street gang. He also contends that the court erred in determining his sentence. We reject defendant's challenges to his conviction but agree that a sentencing error must be corrected. Accordingly, we shall modify the abstract of judgment as discussed below and affirm the judgment in all other respects.

1

## Factual and Procedural History

Defendant was charged with three counts of premeditated murder (Pen. Code,[1] § 187, subd. (a); counts 1-3), one count of attempted murder (§§ 187, subd. (a), 664; count 4), one count of discharge of a firearm at a motor vehicle (§ 246; count 5), one count of participation in a criminal street gang (§ 186.22, subd. (a); count 6), and one count of conspiracy to commit murder (§ 182, subd. (a)(1); count 7). With respect to the three murder counts the information alleged the following special circumstances: multiple first degree murders (§ 190.2, subd. (a)(3)); discharge of a firearm from a motor vehicle (§ 190.2, subd. (a)(21)); and commission of murder to further the activities of a criminal street gang (§ 190.2, subd. (a)(22)). With respect to counts 1 through 5, and 7, the information further alleged that defendant personally discharged a firearm proximately causing death (§ 12022.53, subds. (c), (d), (e)), and that the crimes benefited a criminal street gang (§ 186.22, subd. (b)(1)(C)).

The following evidence was presented at trial:

### *The June 22, 2008 Murders*

Andrew Bologna testified that at about 3:00 p.m. on Sunday, June 22, 2008, he, his father Anthony, and his two brothers were in a car traveling on Congdon Street in the Excelsior District of San Francisco. His father was driving. His brother Michael was in the front passenger seat, and his brother Matthew sat on Andrew's right in the back seat. At the stop sign at Maynard and Congdon, Andrew saw a Chrysler 300 traveling in the opposite direction, turn and block their car from advancing up Congdon. The Chrysler 300 had all tinted windows. Anthony "rolled back" their car to give the Chrysler room to pass. The Chrysler drove "slowly" alongside their car, stopping a foot away from Anthony's window.

Andrew identified defendant as the driver of the Chrysler 300. When defendant pulled alongside their car, he gave Anthony a "mean look" and "pulled out a gun." Andrew saw defendant, holding the gun entirely within the cabin of the Chrysler 300, fire

---

[1] All statutory references are to the Penal Code unless otherwise noted.

2

the handgun at Anthony. Andrew ducked and heard more than three additional gunshots. When the shooting stopped, Andrew felt their car roll back and strike a parked car. Andrew got out of the car and saw the Chrysler drive onto the freeway. Anthony and Michael died that day and Matthew died in the hospital two days later.

Andrew's recorded statement to the police made at the scene was played to the jury. In his taped statement, Andrew described the driver as a Latin male in his mid 20's to early 30's with black hair and a thick mustache. He said he had only a fast glance but a good picture of the driver.

On cross-examination, Andrew acknowledged telling the police that he was not sure if there was another passenger in the Chrysler 300 and he did not know if someone other than the driver was also shooting. He also agreed that he had testified at the preliminary hearing that he did not see his father being shot, but just "heard" it. He insisted at trial, however, that he ducked only after seeing his father shot.

Two witnesses who were driving on Congdon Street at the time of the shooting testified that they heard the gun shots and then saw the Chrysler 300 drive away. One of the witnesses saw at least two people inside the Chrysler and described the driver as "Latin." Another witness testified that while stopped at the intersection of Congdon and Ney Streets, he saw a Chrysler 300 speed past. He saw two Latino men wearing white T-shirts in the front passenger seats, and one person in the back seat. The driver's window was halfway down.

Officer Chad Campos testified that on June 22, 2008, at 3:10 p.m., he responded to Maynard and Congdon Streets to investigate a shots-fired call. A car there contained three men with gunshot wounds. Campos recorded Andrew Bologna's statement to him at the scene. Later, at the police station, Andrew described the driver of the Chrysler as "mugging" the Bologna family members prior to the shooting. Andrew described the shooter as having "close cut cropped hair" and a thick mustache.

On June 24, the police learned that defendant owned a Chrysler 300. The police showed a photograph of defendant, within a six-pack display, to Andrew, who identified

3

defendant as the shooter. Defendant's home was searched that night and defendant was arrested.

### Defendant's Statements

Defendant's post-arrest interrogation was videotaped and five hours of the recording were played for the jury. After having repeatedly denied any connection to the shooting, defendant ultimately acknowledged that he was driving the Chrysler from which the shots were fired but claimed that he did not fire the gun. He said he was afraid to tell the police what had happened because the person that actually committed the crime had threatened him and his family. Shortly thereafter defendant identified Wilfredo Reyes as the shooter. He explained that after two of his fellow gang members, Marvin Medina and Moris Flores, had been shot earlier that day, Reyes called and told him to pick him up in San Francisco. When he did, Reyes directed him to drive to the Mission District. As they were turning to enter the freeway, Reyes announced that the Bolognas were Norteños, reached across him, and shot at the Bolognas through defendant's open window. Defendant claimed that he was not expecting Reyes to fire those shots. He drove away because he was scared. Following his interrogation, defendant informed the police, " 'I can't go to protective custody. My gang might have problems with me if I do.' " He also said, " 'I am a Sureño. Can't be with Norteños,' " and identified his gang as "20th Sureño."

### Forensic Evidence

Criminalist John Sanchez qualified as an expert in firearm and tool mark identification. Sanchez examined bullet fragments collected in the investigation and determined that all of the bullets were fired by the same handgun.

An assistant medical examiner testified that she performed autopsies on the bodies of Anthony, Michael, and Matthew Bologna. She described in detail the wounds suffered by the victims, including where each bullet entered and exited the victims' bodies.

Inspector Ronan Shouldice qualified as an expert in bullet trajectory analysis. Shouldice testified that hypothetical facts in which the driver was the shooter would be consistent with his measurements and calculations of the crime scene. In contrast,

hypothetical facts in which the passenger was the shooter would not be consistent with his findings. He explained that a hypothetical front passenger shooter inside the Chrysler 300 would not have the superior "sightlines" the driver of the Chrysler would have and he considered it highly unlikely that a passenger would fire across or over the driver through the driver's side window. He testified: "For these reasons, and the mathematical limitations, and mostly extrapolating from the trajectory and from what we would call normal handling of a firearm in close quarters strongly suggests that the front passenger's involvement or the possibility of a front passenger involvement would be negligible."

James Norris testified for the defense as a trajectory analyst and crime scene reconstruction expert. He disagreed with Shouldice's conclusion that the only person who could have fired the shots was the driver. He faulted Shouldice for measuring the relevant angle only once and for failing to consider all relevant evidence. Based on his calculation, he believed that the passenger could have positioned himself to see both the front and back seats of the victims' car by leaning over the low console. A photo of a simulated driver taken from Andrew Bologna's back seat position was offered to show that it could appear to Andrew that the driver fired the shots when the front seat passenger was the shooter. Based on the prosecution's hypothetical facts, Norris considered it more likely that the passenger was the shooter, given that four of the five shots hit the victims, and that one victim was hit twice in close proximity, which would be difficult for the driver to have done, but which the passenger more easily could have done. He considered it "not very likely" that the driver was the shooter since to have been so accurate he would have had to extend the gun outside the car, contrary to Andrew's testimony.

### Police Investigation

Officer Eric Perez testified that he analyzed phone records for defendant's cell phone number from May 20 to June 25, 2008 and prepared a chart showing the frequency of calls involving defendant's cell phone and other relevant cell phone numbers. The chart shows 691 calls between Reyes and defendant's cell phone and 183 calls between defendant and Marvin Medina's cell phone. Perez also produced a chart summarizing

5

calls made only on June 22, 2008. Of 301 calls made that day, 64 calls were between defendant and Reyes.

Inspector Newland prepared maps and charts based on the service records of defendant's cell phone showing the location of cell towers activated by defendant's cell phone on June 22, 2008, including the following: 12:27 p.m. in the East Bay; 12:57 p.m. in San Francisco; 1:38 p.m. in Oakland; 2:39 p.m. in San Francisco; 4:20 p.m. in San Bruno; 5:01 p.m. in Richmond; 7:46 p.m. in Oakland; and 8:43 p.m. in San Mateo.

Newland testified that following defendant's arrest and interrogation, investigators began to search for Reyes. When he traveled to South Carolina to take another gang member into custody, he left information about Reyes with his department but he did not have time to investigate possible addresses he had for Reyes in South Carolina. Defendant challenged the sufficiency of the efforts to locate Reyes. He presented testimony by a South Carolina police officer about a contact he had in South Carolina in August 2009 with Reyes, who was then using an alias. The officer claimed he had not seen the "attempt to locate" poster that the San Francisco police officers testified they had left with him when they were in South Carolina. Finally, a defense investigator testified that in January of 2012 he went to South Carolina and confirmed Reyes's alias and located Reyes's former girlfriend.

### *Gang Evidence*

To establish the existence of the MS-13[2] criminal street gang and defendant's association with the gang, the prosecution offered testimony by numerous police officers regarding their interactions with MS-13 gang members in the Excelsior district. Defendant was mentioned in four of the incidents described.

Sergeant Mario Molina testified as an expert witness on MS-13 gang culture. Molina currently investigates all crimes occurring in the Mission district and estimated that he has investigated over 300 MS-13 gang-related crimes. From 2003 to 2008, the 20th Street and the Pasadena Locos Sureños (PLS) cliques within the MS-13 gang were

---

[2] MS-13 is the common abbreviation for La Mara Savatrucha.

6

active in San Francisco. Mission playground is the headquarters of the MS-13 gang in San Francisco. Molina identified a number of known members of the MS-13 criminal street gang and opined that defendant was an active member and that he associated with the PLS clique. Molina explained that Norteños are considered enemies of the Sureño MS-13 gang members and that the Norteños were located primarily in the south side of the Mission District, and in the Ingleside and Excelsior Districts.

Molina testified that gangs operate to maximize respect, recognition and revenge. The MS-13 gang "will retaliate immediately" for perceived slights. Fear in the community promotes respect for the gang. Gang members have to commit crimes or "put in work" for their gang. He explained that " 'putting in work' means that you're actually doing work for the gang. You're acting on behalf of the gang. You're going out there and earn your stripes, putting in work." Gang members who fail to put in work to promote the gang are punished.

Molina testified that MS-13 gang members commit the following violent crimes: homicides, attempted homicides, robberies, sales of narcotics, stealing vehicles, aggravated assaults, and grand theft. He opined that the following specific crimes were committed to benefit the MS-13 gang: the June 19, 2008 stabbing of Marco Dominguez; the May 13, 2008 shooting of David Maxwell; the March 29, 2008 murders of Ernad Joldic and Philip Ng; the December 26, 2007 stabbings of Ronald Donaire and Milagro Moraga; the September 22, 2007 stabbing of Arnulfo Garcia; the February 4, 2006 assault and attempted robbery of Brian Saxsenmeir and Colleen McLaughlin; an April 6, 2004 attempted robbery by defendant; and an October 22, 2003 assault of Vincent Flamburis Castro Molina by defendant.[3]

Marvin Medina also testified as an expert on the MS-13 gang. Medina testified that he came to San Francisco from Los Angeles in 2007 and joined the PLS clique of the

_____

[3] As discussed *post*, the prosecution was required to introduce evidence of "predicate offenses" to establish that the MS-13 engaged in a "pattern of criminal gang activity." Numerous witnesses testified about the details of each of the predicate crimes identified by Molina.

MS-13 gang shortly thereafter. Wilfredo Reyes was the PLS leader at that time. After he joined the gang, defendant took him around the Mission District to show him the gang's territory. Medina testified that he put in work for the gang by committing robberies for the benefit of the gang. He also hunted enemies with Reyes in Oakland. He shot at a person to prove himself to the gang and he and defendant had been ordered to kill a gang member's wife because she was manipulating him and talking to the police, but nothing happened. On cross examination, Medina testified that pursuant to gang "rules" or "culture," a fellow gang member should tell you if he is carrying a gun before he gets in your car.

Medina also testified about a gang-related shooting that had occurred earlier in the day on June 22, 2008. That morning he was shot while driving with another MS-13 gang member in the Mission District. He was injured and called Reyes, who took him to a hospital in Oakland. Later in the evening, Medina called defendant for a ride to San Mateo. On the drive, defendant told him about the Bologna murders.

Medina acknowledged that he lied during the preliminary hearing in this case and subsequently admitted committing perjury. He also acknowledged that he had been granted immunity and relocated by the San Francisco District Attorney and received monetary assistance for rent and food for two years.

Abraham Martinez also testified as an expert on the MS-13 gang. Martinez testified that defendant is married to Martinez's sister and resided in the Martinez family home. Martinez met defendant on 20th Street in San Francisco in 2002 while defendant was "gangbanging." Martinez testified that defendant's gang moniker is "Popeye" and that defendant participated in "jumping" Martinez into the MS-13 gang. Martinez admitted that he stole cars, assaulted, stabbed and shot people to promote his gang. Martinez testified that gang members were expected to "work" for the gang by attacking rival gang members to promote the gang. Martinez testified that defendant had accompanied him when he went "hunting" for Norteños. In one incident, defendant was present when Martinez attacked a man on 20th and Harrison Streets. Martinez and defendant were arrested in 2005 for discharging a gun in El Sobrante. In 2006, defendant

left the 20th Street clique to join the PLS clique of the MS-13 gang because the 20th Street clique was not committing crimes. Defendant said he favored the PLS clique because they committed more shootings.

Martinez also testified about an incident that occurred in March 2008 after a fellow gang member had been shot. He testified that while he and other gang members were at the hospital following the shooting, they discussed "putting in work . . . for revenge." No one knew who committed the shooting but they said they were Norteños, so they were going to shoot Norteños. He explained that when a gang member gets shot, revenge is "mandatory."

The prosecution also offered evidence regarding two murders that occurred after the crimes involved in this case. On July 15, 2008, Guillermo "Sparky" Herrera was arrested for the July 11, 2008 murder of Armando Estrada that took place on 20th and Mission Streets. On July 31, 2008, Ivan Miranda was stabbed to death near Persia and Madrid Streets.

### Defendant's testimony

Defendant testified that his difficult childhood resulted in him being homeless and without parental supervision, which ultimately led to him joining the MS-13 gang. He admitted getting into fights for the benefit of the gang, but claimed that when told by the MS-13 gang leader that he had two weeks to shoot someone, and was asked to join a "hammer team"—meaning to "take out" critical Norteños—he refused. Defendant jumped out of the gang in mid-2006 and got married; his daughter was born in July and they lived with his wife's family, including her brother Abraham Martinez. He never jumped into PLS but Reyes vouched for him and said he had. He testified extensively about his attempts to distance himself from the gang and the trouble that caused him with other gang members. He explained that he had contact information for MS-13 gang members on his phone because even though he was staying away from the gang, he would sometimes sell them drugs.

Defendant testified that on the morning of June 22, Reyes called him for drugs. Reyes told him that Medina had been shot and asked him to drop off the drugs at the

9

hospital. However, defendant did not have time to meet him that morning. Later, Reyes called again saying he was in San Francisco and wanted a ride to the hospital in Oakland. Defendant told Reyes to find another ride. Later that afternoon, defendant decided to go to San Francisco to pick up Reyes and take him to the hospital. After picking up Reyes they came across the Bologna's car. When the driver of that car backed away, Reyes started yelling "chapos" (a derogatory term for Norteños). Defendant saw that Reyes was talking about the "old" driver of the car. As defendant turned to go around that car, he heard gun shots. Reyes had leaned over and shot through his window as he passed the other car. Defendant was scared and slammed on the brakes. He couldn't hear anything but saw Reyes's hand waving and his face saying "go go." Defendant claimed he did not know Reyes was going to kill anyone or that he even had a gun.

Later that day Marvin Medina called and wanted a ride home from Oakland. Defendant picked up Medina and took him to San Mateo. He then drove around San Bruno and picked up his cousin from work, then drove to San Francisco to find his car. He found shell casings in the car and dumped them in a garbage can, then drove home. The next day he washed his car because the gunpowder smell was strong.

The following day at work people teased him, saying they saw his car on the news. He was scared when he learned people had died because he had not seen the news on Sunday or Monday. Defendant was upset with what Reyes had done. Reyes told him to shave his head and threatened him, saying "you know we can get to you" and "you know what happens to your family."

Defendant explained that he initially lied to the police because he was afraid for his family. He knew that if he gave too much information about Reyes to the police, Reyes would know he had snitched, so he tried to give information that Reyes would not connect directly to him.

### Additional Defense Evidence

Dr. Geoffrey Loftus testified for the defense as an expert in memory and perception. He explained that "post-event information" can be added to an original perception-based memory by post-event discussion, interviews, or thinking about the

event, and it combines to make up the eventual memory. In his opinion, because a shooting is much discussed, it would be more likely to result in an initial sparse memory being filled in with post event and real-seeming information.

Defendant's grandmother testified about defendant's difficult childhood and other witnesses testified to his attempts to distance himself from the gang when he was younger.

### Closing Arguments

In his closing argument, the prosecutor argued that defendant went to the Excelsior District on the afternoon of June 22 looking to retaliate against the Norteños for Medina's shooting earlier that day. When he saw the Bologna family in their car, he believed they were Norteños and shot at them with the intent to kill. The defense disputed that defendant was the shooter, claiming instead that Reyes unexpectedly fired the gun at the victims. Defense counsel argued that the jury should acquit defendant of the charged offenses because there was no evidence that defendant had knowledge of what Reyes was going to do and "if there's no knowledge of intent, that lacks proof beyond a reasonable doubt of an intent to kill." In his rebuttal argument, the prosecutor emphasized that even if "Reyes is involved, that doesn't change at all the responsibility of Edwin Ramos, not at all. [¶] . . . [T]he law accepts that two people can be equally guilty of crimes: the direct perpetrator as well as the one that aids and abets, or the co-conspirator."[4]

### The Jury Verdict and Sentencing

The jury found defendant guilty of counts 1 through 4 and 6 (murder, attempted murder and participation in a criminal street gang), but deadlocked on counts 5 and 7 (discharge of a firearm at a motor vehicle and conspiracy to commit murder). The jury

---

[4] The jury instructions included an instruction on aiding and abetting and, as indicated, in closing the prosecutor made brief passing reference to the fact that defendant could be found guilty even if Reyes was the shooter. The jury was unable to agree that defendant personally discharged the firearm causing death, which suggests that some jurors believed the prosecution had not proved beyond a reasonable doubt that defendant was the shooter but believed that, if Reyes was the shooter, defendant nonetheless knew of Reyes' intentions and knowingly facilitated the shooting.

also found true all of the special circumstances and enhancement allegations, except the enhancements for the personal discharge of a firearm proximately causing death, as to which it was deadlocked. (Pen. Code, § 12022.53, subds. (c), (d)).

Defendant was sentenced to state prison for three consecutive terms of life without the possibility of parole, plus 182 years to life.

Defendant timely appealed.

## Discussion

### 1. Defendant's Admissions

Defendant contends that his statements to the police should not have been admitted because they were the result of his sleeplessness, youth, inexperience and implied promises and threats made by the police. Based on uncontroverted evidence, we conclude, as did the trial court, that the statements were voluntarily made and properly admitted.

#### a. *Relevant Background*

Prior to trial, the prosecutor filed an in limine motion seeking permission to introduce at trial defendant's statements to the police. Defendant opposed the motion on the ground that his statements were not voluntary. The following evidence was admitted at a pretrial evidentiary hearing.

Defendant was arrested at his home in the East Bay close to midnight on June 24, 2008. He was taken to an office at the Hall of Justice where he was allowed to watch television until police officers arrived several hours later.

At approximately 4:30 a.m., defendant was taken to a small interview room equipped for videotaping. Defendant was read his *Miranda*[5] rights in English and indicated that he understood each of his rights as they were read. He was read and indicated his understanding of these rights again at about 2:00 p.m.

Defendant was interrogated from 4:30 a.m. until about 5:00 p.m., at which time he was booked into the county jail. The interviews were conducted noncontinuously, with

_____

[5] *Miranda v. Arizona* (1966) 384 U.S. 436.

breaks for bathroom visits and food and water deliveries. Defendant was brought breakfast around 7:00 a.m. and lunch in the afternoon. He was also given water and candy on request.

Four police officers participated in the interrogation, sometimes together and sometimes alone. Until well into the afternoon defendant denied being present at the scene and any involvement in the crimes. Defendant told the police officers that he had not slept all night and expressed concern for his family. After approximately 11 hours of interrogation (including breaks, at least one of which was for over an hour), defendant admitted that he was driving the car but claimed that he was surprised when Reyes pulled out a gun and shot the Bolognas.

After watching the videotapes of the interrogation sessions, the trial court noted that defendant had significant experience in the juvenile justice system and seemed to be familiar with the interrogators, particularly Inspector Molina. The court also noted that defendant was allowed food, access to the bathroom and breaks during which he seemed to sleep or rest when left alone. Finally, the court observed that while the officers did raise their voices, there were "no threats" made and the officer's conduct was not "overbearing such to the point that it would make any of [defendant's] statements involuntary." Based on the totality of the circumstances, the trial court concluded that defendant's statements were voluntary and admissible.

**b. *Analysis***

" '[B]oth the state and federal Constitutions bar the prosecution from introducing a defendant's involuntary confession into evidence at trial.' " (*People v. Duff* (2014) 58 Cal.4th 527, 551.) The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made. (*Ibid*.) When, as here, a defendant made a confession during a tape-recorded interview and the facts surrounding the confession are undisputed, we independently review the trial court's determination of voluntariness. (*People v. McWhorter* (2009) 47 Cal.4th 318, 346.)

" ' "A statement is involuntary if it is not the product of ' "a rational intellect and free will." ' [Citation.] The test for determining whether a confession is voluntary is

whether the defendant's 'will was overborne at the time he confessed.' " ' " (*People v. Duff, supra*, 58 Cal.4th at p. 555.) No single factor is determinative of voluntariness; courts consider "the totality of circumstances" surrounding the confession. (*People v. Williams* (1997) 16 Cal.4th 635, 660.) Factors to consider include " 'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.' " (*Ibid*.) Other characteristics of the defendant to be considered are his or her age, sophistication, prior experience with the criminal justice system, and emotional state. (*In re Shawn D*. (1993) 20 Cal.App.4th 200, 209.)

A confession will also be deemed involuntary if motivated by " ' "any promise made by an officer or person in authority, express or implied, of leniency or advantage to the accused." ' " (*People v. Ray* (1996) 13 Cal.4th 313, 339.) Improper promises are those that impliedly or expressly promise more lenient treatment by the authorities if a confession is given: If the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. The offer or promise of such benefit need not be expressed, but may be implied from equivocal language not otherwise made clear. (*People v. Cahill* (1994) 22 Cal.App.4th 296, 311-312, citing *People v. Hill* (1967) 66 Cal.2d 536, 549.)

In this case, the undisputed evidence establishes that over the course of the interrogation, whether measured from the time of his arrest at midnight or the time the interrogation began four hours later, defendant was given food and drink, opportunities to use the restroom and rest breaks. Defendant undoubtedly was stressed and tired, but the record does not establish that either the length or circumstances of the interrogation were so severe as to render defendant's admissions involuntary. While the officers engaged in persistent interrogation of the defendant, challenging his denial of involvement, our review of the videotape, like the trial court's, reveals no indication that defendant was intimidated by the tone of the questioning, overcome by fatigue, or answering in response

14

to express or implied promises of leniency. Statements by officers that defendant was being given the chance to "come clean," that "[t]his whole thing, it's not gonna be as bad as you think," or that the whole city was outraged and that he had better "start thinking if there was someone else in the car who pulled the trigger," could not reasonably be regarded as threats or implied promises of leniency, and the videotape contains no indication that defendant viewed them as such. Accordingly, there was no error in the admission of defendant's incriminating admissions.

## 2. Officer Newland's "Opinion" Testimony

A significant theme of the defense at trial was that Reyes was the shooter and that the police did not take sufficient steps to locate him because they had already decided to prosecute defendant. To counter this defense, the court allowed Officer Newland to testify why he took certain steps in his investigation. Newland testified that one of his goals in the investigation was to "identify the actual gunman" and that based on Andrew Bologna's statement and identification of defendant, he "absolutely" believed defendant was the shooter. He explained that "Andrew Bologna sat in the back seat, feet away from the murderer, he had a clear view of what happened and unfolded right in front of his face, and that is why he was able to draw a sketch that strongly resembled the defendant, Edwin Ramos. And that's why he was able to pick him out of a photo spread, and ultimately that's what allowed him to save his own life, because he saw this thing right in front of his own eyes." Newland also testified that the physical evidence at the scene did not support defendant's statement that Reyes was the shooter. Newland testified that when defendant identified Reyes as the shooter, he felt it necessary to follow up on the lead, but "strongly suspect[ed] . . . that Wilfredo Reyes was an aider and abettor." Nonetheless, he claimed that he conducted a complete investigation because even if defendant was the shooter, other people might still be "involved and legally culpable" and that was why he went to South Carolina.

Defense counsel objected numerous times on the ground, among others, that Newland's statements constituted improper opinion testimony. The court repeatedly overruled the objections, stating that Newland's testimony was being introduced for the

15

limited purpose of explaining Officer Newland's state of mind and to explain the steps he took during the investigation to locate Reyes. On appeal, defendant contends that the trial court erred in allowing "Newland to give his opinion that appellant was the shooter, that Reyes was the non-shooting accomplice, and that appellant's statement was neither credible nor reliable." He argues that Newland's testimony was an improper assessment of the weight and credibility of the evidence.[6]

A lay witness may offer opinion testimony that is rationally based on the witness's perception and "[h]elpful to a clear understanding of his testimony." In *People v. Virgil* (2011) 51 Cal.4th 1210, 1253–1254, the Supreme Court held a detective could explain why a murder investigation began to focus on a defendant by testifying that a composite of the suspect viewed by the detective resembled the defendant. The testimony was based on the detective's perceptions and was helpful for the jury to understand how the detective came to suspect the defendant and how the investigation came to focus on the defendant months after the murder. (*Id*. at p. 1254.)     In this case, the challenged portions of Newland's testimony consisted largely of opinions or conclusions reached at different stages of his investigation that were based on his perceptions. This testimony explained to the jury how the investigation came to focus on defendant and why greater efforts were not made to locate Reyes in South Carolina. The jury was repeatedly instructed that the challenged testimony was offered for the limited purpose of showing Newlands' state of mind during the course of the investigation and nothing in the record suggests the jury disregarded that instruction. That the jury was not unduly influenced by his testimony is evidenced by the jury's failure to agree to the personal use of a handgun allegation. Thus, the admission of Newland's testimony was neither erroneous nor prejudicial.

---

[6] Contrary to the Attorney General's argument, defense counsel's objections were sufficient to preserve the issue on appeal. Defense counsel objected repeatedly and strenuously to Newland's testimony, and the objections are reasonably understood to include a challenge to Newland's opinions.

### 3. Gang Evidence

The California Street Terrorism Enforcement and Prevention Act (the STEP Act) was enacted in 1988. (§ 186.20 et seq.) Its express purpose was "to seek the eradication of criminal activity by street gangs." (§ 186.21.) The Act criminalizes active participation in a criminal street gang and the commission of other crimes for the benefit of, at the direction of, or in association with a criminal street gang. (§ 186.22, subds. (a) & (b).)[7] The Act defines a "criminal street gang" as "any ongoing association that has as one of its primary activities the commission of certain criminal offenses and engages through its members in a 'pattern of criminal gang activity.' " (*People v. Tran* (2011) 51 Cal.4th 1040, 1044, quoting § 186.22, subd. (f).) The "criminal street gang" component of the act requires proof of three essential elements: "(1) that there be an 'ongoing' association involving three or more participants, having a 'common name or common identifying sign or symbol'; (2) that the group has as one of its 'primary activities' the commission of one or more specified crimes; and (3) the group's members either separately or as a group 'have engaged in a pattern of criminal gang activity.' " (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1222.)

Defendant was charged with one count of participation in a criminal street gang under section186.22, subdivision (a) and it was alleged that that each of the crimes charged benefited a criminal street gang under section 186.22 subdivision (b) and that the three murders were committed to further the activities of a criminal street gang under

---

[7] Section 186.22, subdivision (a) provides: "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for 16 months, or two or three years." Section 186.22, subdivision (b) provides a sentence enhancement for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."

17

section 190.2, subdivision (a)(22).[8] Accordingly, evidence of defendant's gang affiliation and activity was directly relevant to the gang-related charges and enhancements. (*People v. Williams* (1997) 16 Cal.4th 153, 193; *People v. Gardeley* (1996) 14 Cal.4th 605, 619–620.)

Defendant does not dispute the relevancy of the gang evidence, but argues that the court failed to "carefully scrutinize" the admissibility of the gang evidence as required by Evidence Code section 352. (*People v. Williams*, *supra*, 16 Cal.4th at p. 193 ["[E]ven where gang membership is relevant, because it may have a highly inflammatory impact on the jury, trial courts should carefully scrutinize such evidence before admitting it."].) Specifically, defendant contends that the court abused its discretion by admitting (1) excessive evidence of "predicate offences" to establish a "pattern of criminal gang activity"; (2) evidence of two murders which occurred after the charged offenses to establish that murder was a "primary activity" of the gang; and (3) unreliable expert testimony by two known gang members.

**a.** *"Predicate Offense" Evidence*

To establish a "pattern of criminal gang activity," the prosecutor must show that two or more persons, on separate occasions, committed or attempted to commit two or more enumerated offenses (the "predicate offenses"). (§ 186.22, subd. (e); *People v. Tran*, *supra,* 51 Cal.4th at p. 1044.) Evidence of predicate offenses is generally admissible if it is "not more prejudicial than probative and is not cumulative." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223; Evid. Code, § 352.)

In this case, the prosecution initially proposed to prove more than 20 predicate offenses from 2003 to 2008 to establish the "pattern" element. The defense objected that such evidence would be excessive and prejudicial. The prosecution then narrowed the list

---

[8] Section 190.2, subdivision (a)(22), identifies the following as a special circumstance warranting life imprisonment without parole for first degree murder: "The defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang."

to 13 predicate offenses, which the court ruled would be admissible. The court explained that because the trial would be lengthy, the evidence would not consume an undue amount of time; and that although the predicate offenses included murders, they were not so prejudicial as to cause the jury to convict based on the predicate offenses and not the evidence relating to the charged offenses. During the course of the trial, however, the trial court expressed a concern that the evidence on the predicate offenses was becoming excessive, and after reconsideration under Evidence Code section 352, precluded introduction of additional evidence of predicate offenses beyond the eight offenses as to which testimony had already been received.

We review the trial court's ruling on the admission of gang evidence under the abuse of discretion standard. (*People v. Carter* (2003) 30 Cal.4th 1166, 1194.) "The trial court has great discretion in determining the admissibility of evidence, and on appeal, we find reversible error if the trial court's exercise of its discretion was arbitrary, capricious, or patently absurd resulting in a manifest miscarriage of justice." (*People v. Williams* (2009) 170 Cal.App.4th 587, 606.)

Courts have been reluctant to impose a strict rule regarding the number of predicate offenses for which evidence may be introduced. (*People v. Tran, supra,* 51 Cal.4th at p. 1049; *People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436 [upholding admission of six predicate offenses]; see *People v. Hill* (2011) 191 Cal.App.4th 1104, 1137–1139 [approving the introduction of eight predicate offenses to establish the gang-benefit allegation].) In *Tran* the Supreme Court refused to set a limit on the number of predicate offenses that may be admitted, but warned that "the probative value of the evidence inevitably decreases with each additional offense, while its prejudicial effect increases, tilting the balance towards exclusion." (*People v. Tran, supra,* at p. 1049; see *People v. Willliams, supra,* 170 Cal .App.4th at p. 611 ["Although no bright-line rules exist for determining when evidence is cumulative, we emphasize that the term 'cumulative' indeed has a substantive meaning, and the application of the term must be reasonable and practical." ].) In *Rivas* the court noted that "[t]he statute speaks of a 'pattern' and permits the prosecution to introduce evidence of 'two or more' offenses"

and observed that prosecutors reasonably may be "leery of introducing too little evidence about predicate crimes" lest their convictions be overturned on appeal based on insufficient evidence. (*People v. Rivas, supra,* at p. 1436, quoting § 186.22, subd. (a); *People v. Perez* (2004) 118 Cal.App.4th 151, 159–160.)

In this case, the defense disputed that 20th Street and the PLS cliques were criminal street gangs within the meaning of the STEP Act and also disputed that a number of the predicate offenses introduced by the prosecution were gang-related. Therefore, it was entirely reasonable for the prosecution to submit evidence of multiple crimes to ensure satisfying its burden of proof. At the same time, the court was sensitive to the need to avoid prejudicial overkill and limited the evidence of predicate offenses to less than half the number that the prosecution originally intended to present. While a significant number of witnesses testified to predicate offenses, relative to the entire trial this testimony was not excessive or unduly time consuming. The volume of predicate offense evidence did not, as defendant suggests, "extend the trial beyond reasonable limits."

Likewise, the evidence was not unduly prejudicial. Under Evidence Code section 352, " 'prejudicial' is not synonymous with 'damaging,' but refers instead to evidence that ' "uniquely tends to evoke an emotional bias against defendant" ' without regard to its relevance on material issues." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121; *People v. Waidla* (2000) 22 Cal.4th 690, 724 ["Evidence is substantially more prejudicial than probative (see Evid. Code, § 352) [only] if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome.' "].) Although the predicate offenses were serious crimes, the trial court correctly reasoned that the facts involved in these offenses were not more inflammatory than the facts involved in the charged offenses. (*People v. Tran, supra,* 51 Cal.4th at p. 1047 [The potential prejudice in uncharged predicate offense evidence is decreased when the testimony regarding the predicate offense is "no stronger or more inflammatory than the testimony concerning the charged offense."].) Likewise, defendant's participation in some of the predicate offenses provides no basis to exclude the evidence in this case. (*Id.* at p. 1048 ["because the

20

prosecution is required to establish the defendant was an active participant in a criminal street gang and had knowledge of the gang's criminal activities, the jury inevitably and necessarily will . . . receive evidence tending to show the defendant actively supported the street gang's criminal activities. That the defendant was personally involved in some of those activities typically will not so increase the prejudicial nature of the evidence as to unfairly bias the jury against the defendant."].)

Accordingly, we find no abuse of discretion in the admission of the predicate offense evidence.

**b.** *Expert Testimony by Gang Members*

Under Evidence Code section 801, expert opinion testimony is admissible if the subject matter of the testimony is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." The subject matter of the culture and habits of criminal street gangs generally meets this criterion. (*People v. Gardeley, supra,* 14 Cal.4th at p. 617.) Included within "culture and habits" is "testimony about the size, composition or existence of a gang [citations], gang turf or territory [citations], an individual defendant's membership in, or association with, a gang [citations], the primary activities of a specific gang [citations], motivation for a particular crime, generally retaliation or intimidation [citations], whether and how a crime was committed to benefit or promote a gang [citations], rivalries between gangs [citation], gang-related tattoos, gang graffiti and hand signs [citations], and gang colors or attire [citations]." (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 656-657, fns. omitted, disapproved on other ground in *People v. Vang* (2011) 52 Cal.4th 1038, 1047, fn. 3.)

As set forth above, Abraham Martinez and Melvin Medina testified as both percipient witnesses and experts on the MS-13 gang. A considerable portion of their testimony as percipient witnesses was about defendant's history with and participation in the MS-13 gang and, from Medina, the events that occurred earlier in the day on June 22. This evidence was relevant both to the gang enhancements and to establish a motive for the shootings. (See *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167 [Evidence of gang affiliation and activity, though potentially prejudicial, is relevant and admissible

21

when the reason for the underlying crime is gang related.]; *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550 [" '[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence.' "].) Anticipating that some of their testimony might include hearsay or speculation, the court advised defense counsel that the witnesses' testimony was subject to objection. Defendant has not, however, specifically identified any specific testimony for which an objection was lodged and erroneously overruled. Defendant's blanket argument that these witnesses "were given a free hand to testify to hearsay statements and to speculate as to other crimes" is not supported by the record.

The most significant portions of the nonpercipient testimony of these witnesses was the explanation of what it means to put in "work" for the gang, what the gang expects from its members, and the gang's expectation of retaliation or revenge for a shooting. Although Sergeant Molina also testified as an expert on gang culture, the court did not abuse its discretion in allowing this additional testimony. The knowledge and basis for the opinions of Martinez and Medina concerning gang operations was different in relevant respects from that of Sergeant Molina. Martinez's testimony that various gang members discussed revenge after a gang member was shot in March 28, 2008, was properly admitted to support his opinion that revenge would be expected or required after Medina was shot on the morning of June 22. (See *People v. Hill, supra*, 191 Cal.App.4th at p. 1120 ["Gang sociology and psychology are proper subjects of expert testimony [citation] as is 'the expectations of gang members . . . when confronted with a specific action.' "].) Defendant's hearsay objection to this testimony was properly overruled and the jury was informed that the testimony was being admitted for the limited purpose of explaining "gang culture when someone gets shot."

Accordingly, there was no abuse of discretion in the admission of Medina and Martinez's testimony.

**c.** *Evidence of Post-Offense Gang-Related Murders*

As set forth above, the prosecution presented testimony, over defendant's objection, of two murders committed by MS-13 gang members that occurred after defendant had been arrested for the charges in this case. The court found the evidence of the post-offense murders was relevant to establish both that murder is a primary activity of the MS-13 gang and also to dispel defendant's claim that he had not thought that Reyes would commit a shooting. The court also found that the evidence was not unduly prejudicial under section 352 because the additional murders are "certainly no more prejudicial than what he is being charged with."

Defendant contends the court abused its direction under Evidence Code section 352 in admitting this evidence. While defendant is correct that the evidence of post-offense murders committed by other gang members is not relevant to defendant's state of mind at the time of the offense, the evidence is relevant to establish the primary activities of the MS-13 gang. The probative value of this evidence may be diminished to the extent that it is cumulative but its potential for prejudice is diminished by the fact that defendant was not involved. In all events, any possible error in admitting the evidence undoubtedly was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) As noted above, the jury properly heard testimony about eight predicate offenses involving the MS-13 gang, some of which directly involved defendant. Included in this testimony was evidence of two prior murders and a number of other violent crimes. In light of those properly admitted offenses, and the testimony regarding the charged triple homicide, there is no likelihood that "a result more favorable to defendant would have resulted" had the testimony regarding two additional murders committee after defendant was arrested not been admitted.[9]

---

[9] Since we conclude that none of the rulings defendant challenges were erroneous, we necessarily reject defendant's claim of cumulative error.

**4.     Sentencing Error**

At sentencing, the trial court imposed three consecutive life-without-the-possibility-of-parole terms for counts 1 through 3, and also erroneously imposed, separate, consecutive 25-year-to-life terms for these three murder convictions. The Attorney General joins the defendant in requesting that we strike the 25 year-to-life-terms imposed for counts 1 through 3. We agree that the sentence should be three consecutive life-without-the-possibility-of-parole terms for counts 1 through 3, plus 107 years to life. The abstract of judgment should be so modified.

## Disposition

The abstract of judgment shall be modified to strike the 25-year-to-life terms imposed for counts 1 through 3. The judgment is affirmed in all other respects.


_____
                                                        Pollak, Acting P.J.


We concur:


_____
Siggins, J.


_____
Jenkins, J.